Feivel GOTTLIEB, et al., Plaintiffs,

v.

Q.T. WILES, et al., Defendants.

Civ. A. Nos. 89–M–963, 91–M–170, 91–M–408 and 91–M–930.

United States District Court, D. Colorado.

Feb. 11, 1992.

## MEMORANDUM OPINION
## AND ORDER

PRINGLE, United States Magistrate Judge.

This matter comes before the Court on defendant Q.T. Wiles' Motion to Compel Production of documents Withheld Under a Claim of Attorney–Client Privilege and Work Product by Tom H. Connolly, Trustee of the Estate of MiniScribe Corporation; Motion to Enforce the Subpoena to Davis, Graham & Stubbs and to Compel the Production of Documents Called for By the Subpoena Directed to Davis, Graham & Stubbs Withheld Under a Claim of Attorney–Client Privilege and Work Product; and Motion for an Award of Attorney's Fees Against Tom H. Connolly, Trustee of the Estate of MiniScribe Corporation (the "Motion"). The Trustee has filed a Motion for a Protective Order requesting that the Court order Wiles to return certain documents allegedly covered by the attorney-client privilege and/or the work product doctrine which were inadvertently produced during discovery.

In essence, the documents in question can be divided into the following general categories:

a) *Documents consisting of communications between MiniScribe and its*

*former counsel, Davis, Graham & Stubbs ("DGS") generated during the time that defendant Wiles was the Chairman of the Board and Chief Executive Officer of MiniScribe (May of 1985 to February of 1989).*

On January 2, 1992, the Trustee waived the attorney-client privilege with respect to certain categories of these documents. (Item 7, App. I, Wiles' Reply). Specifically, the waiver related to the following subjects: (i) public filings with the SEC; (ii) the investigation into the Lapaglia allegations;[1] (iii) press releases; (iv) communications concerning the JIT warehouses and revenue recognition issues;[2] (v) communications concerning annual or quarterly reports; (vi) communications concerning meetings of the MiniScribe Board of Directors; and (vii) communications regarding MiniScribe's 1987 debenture offering. It is uncertain whether there are other communications between DGS and MiniScribe during the May 1985 to February of 1989 time period for which MiniScribe's Trustee is still asserting an attorney-client privilege.[3]

b) *Documents generated by DGS during the period of May 1985 to February of 1989, withheld by DGS based on a claim of work product.*

1. Richard Lapaglia was terminated in 1986 from his position as a credit and collections manager. Shortly thereafter, he made certain allegations regarding MiniScribe's 1986 revenue recognition practices. In January of 1987, the SEC initiated an informal inquiry focusing on the allegations.

2. In late 1987, MiniScribe entered into certain JIT ("Just–In–Time") warehouse agreements, whereby (a) a product was shipped by MiniScribe to a warehouse located near the warehouse of the company's distributor; and (b) the distributor could then request release of product and take delivery within hours. Based on the JIT agreements, the company may have improperly recorded substantial sales and profit in 1987.

3. Wiles, the Trustee, and DGS have filed well over 100 pages of briefs on this discovery dispute and have appended thereto over 1000 pages of supporting documentation. One would think that this mass of paper would at least contain some particularized identification of the categories of documents being withheld. Unfortunately, this is not the case. The Court has been left to fend for itself, guided only by (a) the very generalized categorization contained in Wiles' Request for Production of Documents and Things to MiniScribe Corporation and Exhibit A to the Deposition Subpoena to DGS; (b) the privilege logs provided by the Trustee which, frankly, are of little help in attempting to establish a workable classification that will aid in resolving the present discovery disputes; (c) the general description contained on pages 1–3 of the Trustee's Memorandum in Opposition to the Motion; and (d) whatever information was supplied by counsel during oral argument regarding the categories of documents still at issue. Consequently, it may well be that this Memorandum Opinion covers matters which are no longer at issue, and/or omits consideration of documents which are being withheld by the Trustee or DGS. To the extent that the Memorandum Opinion is underinclusive and does not provide sufficient guidance to enable counsel to deal with all withheld documents, it may be necessary to conduct further proceedings.

These documents apparently relate primarily to the Lapaglia allegations and subsequent SEC investigation in 1987.

c) *Documents generated by DGS in defending the MiniScribe shareholder litigation in 1989, withheld by DGS based on a claim of work product.*

The nature and subject-matter of these documents has not been identified, other than that they may consist, at least in part, of handwritten and typed notes.[4]

d) *Notes taken by Fried, Frank, Harris, Shriver and Jacobson ("Fried Frank") or DGS attorneys, or by members of the Independent Evaluation Committee ("IEC") during interviews of current or former MiniScribe officers, directors, and employees, and unpublished interview summaries in the possession of the Trustee, withheld because of the Trustee's claim of attorney-client privilege and/or work product.[5]*

e) *Documents and reports generated by Ernst & Whinney ("E & W") during the IEC investigation, withheld by the Trustee on the basis of attorney-client privilege and work product immunity.[6]*

f) *Interview notes, memoranda, and other documentation generated by Fried Frank during its representation of MiniScribe or the IEC, which the Trustee claims is within the attorney-client privilege or is work product, but which the Trustee asserts is not within his custody, possession, or control.*

g) *Correspondence between DGS and Fried Frank regarding the IEC investigation.*

h) *Drafts of the IEC Report, memoranda, correspondence between IEC members, correspondence between DGS or Fried Frank and IEC members in the possession of the Trustee and withheld because of the Trustee's claim of attorney-client privilege and/or work product immunity.*

These materials are presently in the possession of Fried Frank, which has denied the Trustee access to the documents because they are the subject of a retaining lien for legal fees owed by MiniScribe.

Wiles' Motion initially asserts that the Trustee and DGS have effectively waived any claims of attorney-client privilege and or work product by failing to timely assert them and/or by failing to timely provide logs of withheld documents. Wiles further contends that none of the documents relating to the IEC investigation may be withheld as work product because they were not prepared in connection with any existing or anticipated litigation. In addition, Wiles argues that any attorney-client privilege or work product immunity which might otherwise protect materials relating to the IEC investigation has been waived by release of the IEC Report and appendices thereto. Wiles also maintains that the attorney-client privilege and work product immunity have no application because (a) Wiles was the Chairman of the Board and Chief Executive Officer during the time period when the documents in categories a and b above were generated; and (b) the IEC investigation and all materials prepared in connection therewith were for the benefit of the current and former officers and directors of MiniScribe. Finally, the Motion asserts that even if all or part of the subject documents are protected by the qualified immunity afforded to work product, a sufficient showing of need and una-

---

**4.** Commencing February 28, 1989, numerous shareholder class action suits were filed in Colorado and California against MiniScribe, its current and former officers, directors, and employees, its independent public accounting firm (Coopers & Lybrand), Hambrecht & Quist, and Hambrecht & Quist, Inc. Hambrecht & Quist was MiniScribe's underwriter and largest investor.

**5.** On March 28, 1989, the MiniScribe Board of Directors created an Independent Evaluation Committee to investigate alleged financial irreg-

ularities, including the allegations of irregularities which formed the basis for the shareholder suits. The IEC retained the law firm of Fried, Frank, Harris, Shriver & Jacobson to aid in the conduct of the investigation and to act as the IEC's counsel.

**6.** Fried Frank hired Ernst & Whinney (now Ernst & Young) to provide it with consulting services on accounting issues involved in the investigation.

vailability has been made to require their production.

The Trustee's Brief in Opposition to the Motion maintains that (a) Wiles' Motion should be denied for failure to comply with Rule 403(G) of the Local Rules of Practice of the United States District Court for the District of Colorado; (b) most of the documents sought by Wiles fall within category h above, and are not within the Trustee's custody, possession, or control; (c) the documents in the Trustee's possession are protected by the attorney-client privilege or the work product doctrine, and no waiver has occurred; and (d) Wiles has failed to demonstrate sufficient need or unavailability of the materials to meet the requirements of Fed.R.Civ.P. 26(b)(3).

DGS has also filed a Response to Wiles' Motion, contending that (a) there has been no waiver of the attorney-client or work product privilege based upon a failure to timely object; and (b) all other issues between Wiles and DGS are not ripe for judicial resolution because Wiles has not fully complied with Rule 403(G).

I. *Timeliness of objections, the privilege logs, and Rule 403(G)*

Wiles submitted his Request for Production of Documents and Things to MiniScribe Corporation on March 27, 1991 (Ex. A, App. I to Wiles' Motion). On April 26, 1991, MiniScribe responded. The response included the company's objections based on attorney-client privilege and work product. (Item 6, App., MiniScribe's Memorandum in Opposition). MiniScribe's objections to the Request for Production were, therefore, timely under Fed.R.Civ.P. 34(b).

On October 18, 1991, Wiles served a deposition subpoena on DGS (Ex. C, App. I, Wiles' Motion). Exhibit A to the subpoena required DGS to bring numerous docu-

ments to the deposition. On October 28, 1991, Richard P. Holme of DGS sent a letter to Kenneth Starr, Wiles' counsel, objecting to the inspection and copying of all of the materials designated in the subpoena. The basis for the objection was not stated (Ex. D, App. I, Wiles' Motion). Thereafter, on December 9, 1991, a much more detailed Response to the subpoena was prepared and submitted by DGS. The December 9, 1991, Response specifically asserted both the attorney-client privilege and the qualified immunity given to work product (Ex. F, App. I, Wiles' Motion).

■ Wiles contends that DGS' October 28, 1991, letter was an inadequate invocation of the attorney-client privilege and work product doctrine, and that the December 9, 1991, Response was untimely under Fed.R.Civ.P. 45. At the time the subpoena in question was served on DGS, Fed.R.Civ.P. 45(d)(1) merely provided that the person to whom a deposition subpoena was directed could serve "written objection to inspection or copying of any or all of the designated materials within ten days." [7] Once objection was interposed, the party serving the subpoena was not entitled to inspect and copy except pursuant to an order of court. *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 69 (M.D.N.C.1986); *Mattie T. v. Johnston*, 74 F.R.D. 498 (N.D.Miss. 1976). *See also* 9 Wright & Miller, Federal Practice and Procedure § 2458 (1971). As a result, I find and conclude that DGS' October 28, 1991. objection was timely and effective pursuant to former Fed.R.Civ.P. 45(d)(1).

■ The Motion points out that the Trustee failed to provide a complete list of privileged documents, and that DGS has never submitted a privilege log.[8] These

---

**7.** Fed.R.Civ.P. 45 was amended effective December 1, 1991, to increase the time for serving objections to 14 days. In addition, the amendment requires that when production is withheld based on a claim of privilege or work product, such claim must be made expressly and must be supported by a description of the nature of the documents not produced.

**8.** The Trustee attached privilege logs to its Memorandum in Opposition to Wiles' Motion, and,

thereafter, submitted supplemental logs. I cannot determine whether all documents withheld by the Trustee have been logged or not. Certainly any materials held by Fried Frank have not been logged, but the Trustee contends that he does not have control over these records. While DGS, a nonparty, has never provided a written privilege list, all materials called for by the subpoena were brought to the DGS deposition and inquiry was permitted regarding withheld documents. In addition, DGS has offered

omissions, contends Wiles, should be deemed a waiver of any attorney-client privilege or work product immunity. I do not concur. Unlike amended Rule 45(d)(2), effective December 1, 1991, the version of Rule 45 operative at the time of the Request for Production to MiniScribe and the DGS subpoena did not require identification of documents claimed to be privileged. The Advisory Committee's comments to amended Rule 45(d)(2) indicate that this is a new provision. Prior to the December 1991 amendment, a party could seek such information through written interrogatories or in connection with a motion to compel production of materials subpoenaed pursuant to former Rule 45. *E.g., AM International, Inc. v. Eastman Kodak Co.*, 100 F.R.D. 255 (N.D.Ill.1981). I find no authority, however, for the proposition that, under the pre-December 1, 1991 discovery rules, the failure to supply a privilege log automatically resulted in a waiver of any privilege which otherwise existed.[9]

■ I also reject the argument of the Trustee that Wiles has not adequately complied with Rule 403(G). On May 16, 1991, Wiles' counsel sent a lengthy letter to counsel for the Trustee outlining his views with respect to the Trustee's claims of privilege and work product, offering to confer on the subject. (Ex. J, App. I, Wiles' Motion). Subsequent inquiries were made as to whether the Trustee intended to persist in his position. A concrete response to these inquiries was not forthcoming until January 2, 1992. I, therefore, conclude that Wiles' attorney did make a reasonable effort to confer with opposing counsel before filing the Motion.

## II. *Communications between DGS and MiniScribe, and documents generated by DGS between 1985 and 1989 (categories a and b)*

■ While it is by no means clear from the pleadings, MiniScribe may still be asserting that certain communications between the company and DGS during the period from 1985 to 1989 fall within the attorney-client privilege.[10] DGS maintains that various documents generated in connection with its representation of MiniScribe during the same time frame are immunized from production by the work product doctrine.[11] While the subject documents may well fall within the scope of the attorney-client privilege or the work product immunity, I do not believe that they are protected from disclosure under the circumstances presented here.

■ We begin with the proposition that the cloak of confidentiality afforded by the attorney-client privilege and the work product doctrine is not absolutely limited to the attorney and his client. Others may come within the mantle of protection, and disclosure to them does not constitute a breach of confidentiality. *E.g., Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir.1985) (attorney-client privilege); *American Standard, Inc. v. Bendix Corp.*, 71 F.R.D. 443 (W.D.Mo.1976) (work product). On the other hand, disclosure to outsiders may well destroy the otherwise confidential nature of the communications or information, and result in a waiver of any attorney-client or work product privilege. *E.g., In re Subpoenas Duces Tecum*,

---

to dictate a privilege log for transcription by Wiles.

**9.** It would be incorrect, however, to say that omission of a log identifying documents withheld on the ground of privilege had no adverse implications. The party asserting privilege still had the burden of establishing its existence. To the extent that a privilege log was necessary to validate a claim of privilege, the lack of a such log could result in a failure of the claimant to sustain his burden of proof. *See Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540 (10th Cir. 1984), *cert. dismissed*, 469 U.S. 1199, 105 S.Ct. 983, 83 L.Ed.2d 984 (1985).

**10.** The Trustee has the power to waive the attorney-client privilege for the corporation. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

**11.** The work product doctrine may be raised by either the attorney or the client. *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 63 (7th Cir.1980); *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir.1979); 4 Moore's Federal Practice ¶ 26.64[4], at 26–390 (1991).

738 F.2d 1367 (D.C.Cir.1984); *In re Sealed Case,* 676 F.2d 793 (D.C.Cir.1982).

■ It is clear that, at the time the materials in categories a and b above were generated, Wiles was not an outsider. As the Chairman of the Board and Chief Executive Officer, he was squarely within the class of persons who could receive communications and work product from Mini-Scribe's counsel without adversely impacting the privileged or confidential nature of such material. *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Even under the narrower pre-*Upjohn* "control person" test, disclosure of attorney communications to a director would not have adversely affected the privilege. *See Natta v. Hogan,* 392 F.2d 686 (10th Cir.1968).

Of course, Mr. Wiles is no longer a director or officer of MiniScribe. Indeed, he and the company presently occupy adverse positions. This post-February 1989, change in circumstances gives rise to the more difficult question of whether the corporation, Trustee and/or DGS can now withhold the documents in categories a and b from Wiles on the basis of attorney-client privilege or work product immunity. It is certainly true that the attorney-client privilege belongs to the corporation, or its Trustee, and that Wiles has no power to either assert or waive it. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). However, that is not the issue before the Court. The fact that former officers and directors lack the power to waive the corporate privilege does not resolve the question of whether they themselves are precluded by the attorney-client privilege or work product doctrine from inspecting documents generated during their tenure. There is a surprising dearth of authority on this subject. Nevertheless, at least one case has considered this very issue, holding that a corporation may not assert the attorney-client privilege against a former director in such a situation. *Kirby v. Kirby,* No. 8604, 1987 WL 14862 (Del.Ch., July 29, 1987) (LEXIS, States Library, Del. file).

■ An analogous situation presents itself when parties with a common interest retain a single attorney to represent them. When they later become adverse, neither is permitted to assert the attorney-client privilege as to communications occurring during the period of common interest. *Garner v. Wolfinbarger,* 430 F.2d 1093, 1103 (5th Cir.1970); McCormick on Evidence § 91, at 219 (3d Ed.1984); VIII Wigmore on Evidence § 2312, at 603–804 (McNaughton rev. 1961). *See also Pattie Lea, Inc. v. District Court,* 161 Colo. 493, 423 P.2d 27, 30 (1967).

■ Similar considerations apply to the work product doctrine. An attorney may not withhold work product from his own client. *Spivey v. Zant,* 683 F.2d 881 (5th Cir.1982); *Roberts v. Heim,* 123 F.R.D. 614 (N.D.Cal.1988); 4 Moore's Federal Practice ¶ 26.64[2], at 26–361 (1991). In the corporate setting, this principle would clearly require counsel to provide work product to the company's board of directors. The policy underlying the work product doctrine would not be advanced by now denying Wiles access to documents which he could have seen upon request at the time they were generated.

III. *Documents prepared by DGS in defending the MiniScribe shareholder litigation in 1989 (category c)*

■ Unlike the papers and tangible things prepared by DGS as MiniScribe's counsel while Wiles was member of the Board of Directors and CEO, the documents in category c were prepared after Wiles had resigned. Hence, the considerations militating against application of the work product doctrine discussed in section II above have no application to the materials in category c. To the extent they were, in fact, prepared in connection with the shareholder litigation which commenced in late February of 1989, they would fall within the definition of work product contained in Fed.R.Civ.P. 26(b)(3). No showing has been made that there is an overriding need for their disclosure, as required by Rule 26(b)(3), and, insofar as the materials may contain mental impressions of counsel,

even a stronger demonstration of need would be required. *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982).[12]

Since no privilege log has been provided by DGS, it is impossible to determine with precision which of the DGS withheld documents fall within category c. I, therefore, order DGS to supply a log of all materials which it is withholding on the basis that they were generated in defending the MiniScribe shareholder litigation. If counsel for Wiles and DGS then disagree as to whether certain documents identified on the log come within this category, the documents should be submitted to the Court for an *in camera* review.

IV. *Notes taken by Fried Frank, DGS, and committee members during interviews of current or former MiniScribe officers, directors, and employees, unpublished interview summaries, and documents and reports prepared by E & W in connection with the IEC investigation (categories d and e)*

■■■ As part of investigation conducted by the IEC, current and former officers, directors, and employees of MiniScribe were interviewed by Fried Frank, DGS, and members of the committee. Notes were taken during the interviews and, thereafter, these notes served as the basis for the preparation of interview summaries, as well as the committee's final Report. The final Report cites extensively to the interview summaries, and most of the summaries are included in an appendix to the Report.

Insofar as the notes taken and the summaries prepared by Fried Frank and DGS memorialize information provided by then current officers, directors, and employees during the course of interviews, they contain the substance of communications to an attorney by the client. *See Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).[13] Further, notes and summaries relating to interviews of former directors, officers, and employees are typically considered to be work product. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir.1970), *aff'd*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). Nevertheless, for the reasons enumerated below, I find and conclude that neither the attorney-client privilege nor the work product doctrine operates to prevent disclosure of interview notes and unpublished interview summaries.

■■■ The attorney-client privilege is designed to implement the public policy favoring full and open discussions between a client and his lawyer. The theory behind the privilege is that confidential communications will be impeded if the attorney and client are not assured that such communi-

---

12. There is a further exception to the attorney-client privilege and work product doctrine when the documents in question relate to the precise matter or matters at issue in the instant litigation, and it would be unfair for the plaintiff to withhold such documents because they are needed by the defendant to meet the issues raised by the complaint. *E.g., Potomac Elec. Power Co. v. California Union Ins. Co.*, 136 F.R.D. 1 (D.D.C.1990); *Charlotte Motor Speedway, Inc. v. International Ins. Co.*, 125 F.R.D. 127 (M.D.N.C.1989). However, based on the record before me, I am unable to determine whether any of the subject documents fall within the "at issue" exception.

13. Under *Upjohn*, interviews given in confidence by corporate employees to lawyers retained *by the company* may fall within the attorney-client privilege. In this case, it is difficult to determine exactly who Fried Frank was rep-

resenting. For example, the IEC report expressly states that Fried Frank was representing only the committee and not the corporation (IEC Report at 40–43). On the other hand, during the deposition of Robert Sparacino, counsel for the Trustee unequivocally stated the Fried Frank represented MiniScribe, and, of course, the MiniScribe Trustee has consistently taken the position that he now controls the privilege (Ex. Q at 65–66, App. II, Wiles' Motion). I have accepted the Trustee's position and have regarded Fried Frank to have been counsel for MiniScribe, as well as counsel for the IEC. Ultimately, the question of whether Fried Frank represented the IEC, the company, or both is probably of little consequence in light of my findings and conclusions. Nevertheless, the problem serves as an example of the type of posturing that has permeated these discovery disputes and made resolution of them more difficult by many fold.

cations will remain private. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C.Cir.1981). Consequently, the *sine qua non* for invocation of the privilege is that the communications in question were intended to be confidential. *United States v. Rockwell Int'l.*, 897 F.2d 1255, 1265 (3d Cir.1990); *Permian Corp. v. United States, supra; United States v. Bump*, 605 F.2d 548, 551 (10th Cir.1979) ("When a matter is communicated to the lawyer with the intention or understanding it is to be repeated to another, the content of the statement is not within the privilege."). Furthermore, one may not release documents which pervasively cover a particular subject matter and then claim that the underlying supportive data is privileged. *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir.1984) ("[I]f a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as 'the details underlying the data which was to be published' will not enjoy the privilege."); *In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir.1984); *United States v. Cote*, 456 F.2d 142 (8th Cir.1972). These limitations on the scope of the privilege are consistent with the principle that the attorney-client privilege is to be strictly construed. *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir.1984); *Matter of Grand Jury Subpoena Duces Tecum*, 697 F.2d 277 (10th Cir. 1983).

The interviews conducted by Fried Frank and DGS of current officers, directors, and employees of MiniScribe were a significant part of the raw material that was utilized to create the comprehensive written Report. Although interviewees were told that their statements were privileged, it was made clear to them that they had no right to insist on confidentiality, and that the company would make all the decisions concerning whether and to whom the infor-

mation obtained would be released (IEC Report at 60). It is undisputed that the Report itself was never intended to be entirely confidential, (IEC Report at 42–43), and, in fact, upon its completion, the Report was provided to the SEC, the U.S. Attorney's office, Standard Charter Bank, and the litigants in the coordinated cases.[14] Certainly, the SEC, the U.S. Attorney and many of the parties in the coordinated actions were either adverse or potentially adverse to the company. The Report, which covers the entire history of the company and its downfall in minute detail, is replete with citations to interview summaries and, indeed, most of the summaries are contained in the appendix thereto. In addition, a very detailed summary of the Report's salient points was incorporated into a press release that, in turn, was attached to the MiniScribe 8–K public filing (Ex. P, App. II, Wiles' Motion).

These facts demonstrate beyond peradventure that neither the interviewees nor the interviewers had any real expectation that the information obtained during the interview process would remain confidential, and I so find. Under these circumstances, withholding the interview notes themselves under a claim of attorney-client privilege simply elevates form over substance. Further, given the pervasive disclosures contained in the Report and interview summaries, and the publication of these materials to both friend and foe, there can be no doubt that any privilege which arguably might have once attached to the interview notes has been waived. *See United States v. Rockwell Int'l.*, 897 F.2d 1255 (3d Cir.1990); *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982); *United States v. Cote*, 456 F.2d 142 (8th Cir.1972).

■ A more difficult problem exists with respect to the work product doctrine. The policy underlying work product immunity is different than that supporting the attorney-client privilege. The purpose of

---

**14.** While the IEC Report is replete with references to the fact that the investigation was confidential, the fact of the matter is that the IEC and the company released the report and a substantial amount of the underlying data, such as witness summaries and the like, whenever it believed that it was in the company's interest to do so.

the qualified immunity afforded to work product is to protect documents generated by an attorney or those associated with him in a litigation effort against disclosure to the opposing party. *Hickman v. Taylor, supra;* S. Cohn *The Work–Product Doctrine: Protection, Not Privilege,* 71 Georgetown L.Rev. 917 (1983). Once documents are voluntarily provided to an adversary, the qualified work product immunity is lost as to those items. *In re Subpoenas Duces Tecum,* 738 F.2d 1367 (D.C.Cir.1984). The law is unclear, however, as to whether the submission of a work product document to an adverse party also waives the work product protection for the underlying notes and memoranda dealing with the same subject matter. Wright and Miller suggests that it does not. *See* 8 Wright & Miller, Federal Practice and Procedure § 2024, at 209 (1971). The Court of Appeals for the District of Columbia Circuit recognized the issue, but declined to resolve it. *In re Sealed Case,* 676 F.2d 793, 817 (D.C.Cir.1982) ("We do not consider whether we would imply a waiver in other types of litigation [i.e., other than in the context of a grand jury subpoena] for all of Company's privileged files relating to the report."). *See also In re Subpoenas Duces Tecum, supra,* where, in a private litigation setting, the Court found an implied waiver of work product immunity regarding documents actually given to an adversary.

■ For purposes of this case, I need not decide the issue left open by *In re Sealed Case, supra,* and *In re Subpoenas Duces Tecum, supra.* There is yet another reason why neither the Trustee nor DGS may claim attorney-client privilege or work product immunity with respect to notes and unpublished summaries of Fried Frank and DGS interviews of past and then current officers, directors, and employees. As indicated in section II of this Memorandum Opinion, the confidentiality protected by the attorney-client privilege and the work product doctrine is not breached by exchange of documents and information between persons with a common interest in the subject matter thereof, and no waiver occurs by virtue of such exchanges. *Unit-*

*ed States v. American Tel. & Tel. Co.,* 642 F.2d 1285 (D.C.Cir.1980); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26 (D.Md. 1974); *Vilastor–Kent Theatre Corp. v. Brandt,* 19 F.R.D. 522 (S.D.N.Y.1956). Moreover, should parties who shared a common interest at the time privileged and/or work product documents were generated later become adversaries, neither is entitled to assert work product or attorney client privilege as a basis for withholding the documents from the other. McCormick on Evidence § 91, at 219 (3d Ed.1984); VIII Wigmore on Evidence § 2312, at 603–604 (McNaughton rev. 1961). *See also Waste Mgmt. Inc. v. International Surplus Lines Ins. Co.,* 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991).

The record in this case clearly demonstrates that the relationship between Wiles and MiniScribe falls squarely within the common interest doctrine. At the time of the IEC investigation, shareholder suits were pending against MiniScribe and many of its current and former directors and officers, including Wiles. The expressed intent of the IEC and MiniScribe was that the investigation would benefit both the company and the current and former directors and officers. Based on representations by DGS as MiniScribe's counsel, MiniScribe induced National Union Fire Insurance Company, the insurer under the Directors and Officers Insurance and Company Reimbursement Policy, to pay approximately $1,000,000 for defense expenses and attorneys' fees in connection with the MiniScribe securities litigation. In essence, these funds were used to defray a portion of Fried Frank's bill for services rendered in connection with the IEC investigation.

Specifically, on November 22, 1989, DGS wrote to Andrew Simmonds, an attorney representing National Union, stating as follows:

I am writing on behalf of our client, Miniscribe Corporation ("Miniscribe"). In accordance with our previous discussions and the provisions of the Directors and Officers Insurance and Company Reimbursement Policy No. 352–91–75 ("Policy"), we hereby request reimbursement

of $1,000,000 from National Union to Miniscribe for defense expenses and attorneys fees as of November 17, 1989 in the above-referenced litigation [the Miniscribe securities litigation]....

. . . . . .

.... As counsel for the Independent Evaluation Committee of the Miniscribe Board of Directors, Fried, Frank organized a massive document production and collected over 300,000 pages of documents for use in its investigation. These documents will also be used by Mini-Scribe and its various officers and directors in defense of the pending securities litigation. The officers and directors would have had to collect, organize and review these documents in any event in connection with such litigation.[15] *In addition, much of the factual investigation done by Fried, Frank for the Report can be used by the insureds in defense of the pending litigation....*

(Ex. A(3), App. I to Wiles' Motion) (Emphasis added.)

The above quoted letter unequivocally represents that (a) MiniScribe and the officers and directors covered under the National Union policy (including Wiles) had a common interest in the pending securities litigation; (b) Fried Frank's work, both in compiling MiniScribe documents *and* in conducting a factual investigation, would inure to the benefit of these officers and directors, as well as the company; and (c) the data collected from this investigation would be available to the officers and directors, and could be used by them in defense of the litigation. Likewise, National Union clearly understood that its payment of a substantial portion of the Fried Frank bill was for the purpose of furthering the common interests of MiniScribe and the insured officers and directors in defending the securities cases which had been filed. For example, on February 20, 1990, Mr. Simmonds wrote to all defense counsel for

the director and officer defendants, with a copy to Mr. Loeb of DGS, stating:

National Union Fire Insurance Company of Pittsburgh, Pa., ("National Union") in order to support the defense of the directors and officers, pursuant to their request will pay the costs of copying all of the Fried Frank documents thereby making a set available to all defense counsel at the offices of Holmes & Starr. This will allow all defense counsel who wish to review the documents ready access without undue delay.

\* \* \* \* \* \*

*Davis Graham asserts, however, that the director and officer defendants will be given full access to the documents and information developed by Fried Frank relating to or touching upon this litigation.* Hopefully, the Fried Frank materials will be helpful in providing the factual background in the matter and will serve to avoid expense and effort which you might otherwise incur. To this end we would also hope that you make a sincere effort to closely coordinate activities and avoid any duplication of efforts.

(Ex. A(1), App. I to Wiles' Motion) (Emphasis added.)

Having accepted some $1,000,000 from National Union to be applied against the Fried Frank bill, and having represented to the insurer that Fried Frank's investigatory work would be made available to the insured directors and officers, neither MiniScribe (through its Trustee) nor DGS, as MiniScribe's former counsel, may withhold documents generated as part of the investigation from Wiles on the basis of privilege or work product.

■ For the same reasons, I find and conclude that reports, notes, and memoranda of E & W relating to IEC investigation must be produced, even assuming arguendo that they might be covered by the attorney-client privilege or work product doc-

---

**15.** The Trustee contends that the National Union payment was only for the purpose of obtaining access to the some 300,000 documents reviewed by Fried Frank, and that these documents have been made available without objec-

tion. However, as is clearly revealed in the next sentence of the DGS letter (italicized in the text above), DGS' offer of cooperation on behalf of MiniScribe was much broader than simply providing access to company documents.

trine.[16] E & W was hired by Fried Frank to assist in the investigation (IEC Report at 41). As noted above, the investigation was purportedly to benefit the common interests of MiniScribe and its current and former officers, directors, and employees. MiniScribe, through its counsel, so represented to the insurance carrier for these individuals, and further represented that factual information generated by Fried Frank would be available to the insureds. The data flowing from the Fried Frank investigative effort included not only facts uncovered by Fried Frank itself, but also information unearthed by Fried Frank's retained assistants, such as E & W. References to E & W's work appear throughout the IEC Report, and E & W's own report is appended to that of the committee.

In short, neither the attorney-client privilege nor the work product doctrine precludes production of the E & W documents because (a) there was no reasonable expectation that the substance of the documents would remain confidential; (b) the materials were utilized to prepare the IEC and E & W Reports, both of which were circulated to adversaries and friends alike; and (c) E & W's work was intended to inure to the mutual benefit of MiniScribe and former officers and directors such as Wiles.

V. *Documents in the possession of Fried Frank (category f)*

The threshold issue presented by the documents in category f is whether they are in the "possession, custody or control of the party upon whom the request [was] served." Fed.R.Civ.P. 34(a). The Trustee states that the materials in category f, although prepared on behalf of MiniScribe, have remained in the possession and custody of Fried Frank. He further points out that Fried Frank has asserted a retaining lien against the materials, and refuses to release them. Thus, contends the Trustee, the documents are not within his control, and he has no greater ability to access them than does Wiles.

The term "control," as used in Rule 34(a), has been defined as the legal right to obtain the subject documents on demand. *United States v. International Union of Petroleum & Indus. Workers,* 870 F.2d 1450 (9th Cir.1989); *Searock v. Stripling,* 736 F.2d 650 (11th Cir.1984). While Fried Frank's retaining lien ultimately may be deemed ineffective, at the present time the Trustee cannot obtain the subject documents from Fried Frank on demand. Consequently, I deny the Motion to Compel the production of documents within category h.

Wiles' contention that an attorney's lien against the client does not affect the rights of another party to discovery may well be true. *See Jenkins v. Weinshienk,* 670 F.2d 915 (10th Cir.1982). This, however, simply reinforces my conclusion that the appropriate procedure for obtaining these materials is through a deposition subpoena duces tecum to Fried Frank, and not through a Request for Production directed to the Trustee.

VI. *Correspondence between DGS and Fried Frank, drafts of the IEC Report, memoranda, correspondence between IEC members, and correspondence between DGS or Fried Frank and IEC members (categories g and h)*

There remain for consideration miscellaneous materials relating to either the Fried Frank investigation, the IEC Report, or both. Unlike the other categories of documents, I do not believe that the discoverability of the materials in categories g and h can be determined without additional information concerning their content. As a result, the best course would appear to be for the Court to set forth certain guidelines consistent with the reasoning discussed above, and then allow the parties to apply these guidelines to the subject materials. In the event an agreement cannot be reached, the disputed items should be submitted to the Court for an *in camera* review.

Initially, and as discussed more fully above, I find and conclude that documents relating to either the IEC investigation or the IEC report either are not subject to the

---

**16.** In light of the opinion in *In re Grand Jury Proceedings,* 658 F.2d 782 (10th Cir.1981), I have grave doubts that the E & W documents would even qualify as work product.

attorney-client privilege (because there was no expectation that the subject matter or facts revealed by the investigation would be kept confidential), or that the privilege was waived by publication of the Report and appendices thereto. In addition, to the extent the documents contain factual information derived from the investigation, they are covered by the common interest doctrine and must be produced, regardless of whether they are claimed to be protected by the attorney-client privilege or the qualified immunity attaching to work product.

 Up to this point, I have found it unnecessary to resolve the question raised by Wiles' counsel that the IEC investigation and Report were not prepared in connection with pending or anticipated litigation. Although there were lawsuits pending by the time the investigation commenced, this is not dispositive of the issue. *United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Temp.Emer.Ct.App.1985). Rather, the query must be whether the primary motivating purpose behind the creation of the document was to assist in pending or impending litigation. *Id. United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir.1981). The burden of establishing the elements necessary to qualify a document for work product protection is on the party resisting discovery. *Hamel v. General Motors Corp.*, 128 F.R.D. 281 (D.Kan.1989).

Whether the Fried Frank investigation was undertaken primarily to assist the litigation effort, or principally to provide factual background to the IEC so that it could recommend corrective action is a very close question. I have substantial doubts as to whether the Trustee and DGS have sustained their burden of proving that the former purpose was paramount. Nevertheless, even if the investigation itself can be deemed to have been undertaken for the purpose of litigation, that does not mean that every document generated in connec-

tion therewith also was primarily motivated by a desire to assist the litigation effort. Thus, in addition to applying the criteria set out above, counsel should review each document claimed to fall within categories g and h to determine whether it meets the "anticipation of litigation" test.[17]

VII. *The Trustee's Motion for Protective Order*

The Trustee's Motion for Protective Order should be disposed of by my rulings on Wiles' Motion. Any documents falling within category c above which were inadvertently produced during discovery should be returned. As to any inadvertently produced items falling within categories g and h, resolution of the Trustee's Motion must await the parties' compliance with section VI of this Memorandum Opinion. In all other respects, the Trustee's Motion is denied because the documents are subject to discovery.

BASED ON THE FOREGOING, it is hereby ORDERED that:

1. Wiles' Motion is GRANTED as to documents within categories a, b, d, and e above. These documents should be made available by the Trustee and/or DGS within 10 days.

2. Wiles' Motion is DENIED as to documents within category c above. DGS shall provide a privilege log to Wiles within 10 days.

3. Wiles' Motion is DENIED as to documents in category f.

4. The Court will hold in abeyance Wiles' Motion with respect to documents falling within categories g and h, until such time as the parties have complied with the directives contained in Section VI of this Memorandum Opinion.

5. The Trustee's Motion for Protective Order is granted as to documents falling within category c; is held in abeyance as to documents within categories g and h pend-

---

**17.** The contention that the IEC report was primarily generated to assist in pending or future legal actions rests on an even more tenuous thread. Exactly how the written memorialization of the facts uncovered in the investigation and subsequent dissemination of this literature to the SEC, the U.S. Attorney, and the parties themselves assisted the litigation effort is a puzzle which neither the Trustee nor DGS has chosen to unravel in their various briefs. As a result, although I have not reviewed the documents for content, I would strongly suspect that drafts of the IEC Report would not meet the criteria for work product.

**254**

ing compliance with the directives contained in Section VI of this Memorandum Opinion; and is denied in all other respects.

6. I find and conclude that many of the questions raised by the Motion and the Trustee's opposition thereto are difficult and involve unsettled law, and that there is otherwise substantial justification for the Trustee's opposition. Consequently, Wiles' request for attorney fees and expenses is DENIED.