Harold C. LANE, Jr., Plaintiff-Respondent,

v.

SHARP PACKAGING SYSTEMS, INC., Paul W. Scarberry and Virginia Scarberry, Defendants-Appellants,

John H. NIEBLER and Niebler, Pyzyk, Klaver & Wagner, LLP, Intervening-Appellants.

Supreme Court

*No. 00–1797. Oral argument November 5, 2001.—Decided March 20, 2002.*

2002 WI 28

(Also reported in 640 N.W.2d 788.)

75

For the defendants-appellants there were briefs by *Larry J. Britton, William J. Richards* and *Vlasak &*

*Britton, S.C.,* Milwaukee, and *James Reiher, Terrance E. Nilles* and *von Briesen, Purtell & Roper,* Milwaukee, and oral argument by *Larry J. Britton* and *James C. Reiher.*

For the intervening appellants there were briefs by *Terry E. Johnson, Maria D. Sanders* and *Peterson, Johnson & Murray, S.C.,* Milwaukee, and oral argument by *Terry E. Johnson.*

For the plaintiff-respondent there was a brief by *James O. Huber, Maureen A. McGinnity, David W. Simon* and *Foley & Lardner,* Milwaukee, and oral argument by *Maureen A. McGinnity.*

¶ 1. N. PATRICK CROOKS, J. This case is before the court on certification by the Court of Appeals, District II, pursuant to Wis. Stat. § 809.61 (1999–2000).[1] While this case arises from the termination of Harold C. Lane (hereinafter Lane) by his employer, Sharp Packaging Systems, Inc. (hereinafter Sharp), the issues before this court relate to the parties' discovery dispute. During discovery, Lane filed a subpoena duces tecum, requesting documents from Attorney John Niebler (hereinafter Niebler) and his law firm, Niebler, Pyzyk, Klaver & Wagner, LLP, (hereinafter the Niebler law firm) regarding their representation of Sharp. Lane also filed a subpoena duces tecum requesting production of documents from third parties, including M&I Mortgage Co. Sharp and the Scarberrys, the sole shareholders, filed motions to quash both subpoenas. The circuit court denied both motions and we now address the discovery issues in dispute. Specifically, we address: (1) whether a corporation can invoke the lawyer-client privilege against a former member of the

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

corporation's board of directors; (2) whether an attorney's billing records are protected by the lawyer-client privilege; (3) whether the circuit court erred in ordering production of documents reflecting communications with third parties; (4) whether the circuit court should conduct an in camera review of records when otherwise privileged records are sought under the crime-fraud exception to the attorney client privilege; and (5) whether documents created prior to an employee's termination are protected as work product. We also review the circuit court's award of attorneys' fees.

¶ 2. Recognizing that the discovery issues in this case are matters of first impression and that the issues "go to the very core of the lawyer-client relationship and the reach of the lawyer-client privilege" the court of appeals certified the case to this court. We review the Waukesha County Circuit Court's decision, the Honorable Kathryn W. Foster, presiding, regarding the lawyer-client privilege, the work product doctrine, and the award of attorneys' fees.

¶ 3. We first address whether the circuit court erroneously exercised discretion in concluding that the documents requested from Niebler and his law firm are not protected by the lawyer-client privilege. We first conclude that Sharp can effectively assert the lawyer-client privilege against Lane. Lane's status as a former director does not allow him to waive the lawyer-client privilege as a representative of Sharp, nor does Lane's status preclude the current board of directors from asserting the lawyer-client privilege against him regarding documents prepared during his tenure. Second, we conclude that attorney billing records are protected by the lawyer-client privilege. The circuit court erroneously exercised its discretion by failing to examine the

nature of the billing records in this case, specifically, that the billing records reveal the nature of legal services provided and the substance of lawyer-client communications. Third, we conclude that the circuit court did not erroneously exercise its discretion in ordering production of non-privileged documents reflecting communications with third parties. The circuit court carefully examined the relevant facts, applied the proper standard of law, and reached a reasonable conclusion on that issue. Finally, we conclude that the circuit court did not erroneously exercise its discretion in concluding that Lane established a prima facie case that the crime-fraud exception to the lawyer-client privilege applies. We further conclude, however, that the circuit court did err in failing to conduct an in camera review. Rather than considering the appropriate factors, the circuit court simply allowed Lane to overcome the lawyer-client privilege by establishing a prima facie case. Upon remand, we instruct the circuit court to conduct an in camera review to determine if the crime-fraud exception applies.

¶ 4. In addition to the lawyer-client privilege issues, we review the circuit court's decision that prior to May 31, 1999, litigation was not imminent and documents prepared during that time are not protected by the work product doctrine. We conclude that the circuit court erroneously exercised its discretion because it failed to apply the proper standard of law and did not conduct an in camera review to determine if the documents were prepared or obtained in anticipation of litigation.

¶ 5. Finally, we review the circuit court's award of attorneys' fees to Lane. Based on the record, we conclude that the circuit court's award of half the attor-

neys' fees and expenses pertaining to two motions was reasonable and not an erroneous exercise of discretion.

## I. FACTS

### A. Lane's Employment with Sharp

¶ 6. Sharp Packaging Systems, Inc. (Sharp) is a Wisconsin corporation of which Paul and Virginia Scarberry (hereinafter the Scarberrys) are, and at all relevant times have been, the sole shareholders. In 1992, Harold C. "Bud" Lane joined Sharp as Executive Vice President of Marketing and Sales. During his employment, Lane and Sharp maintained several agreements, including an employment agreement, a stock option agreement, a stock transfer restriction agreement, and a non-compete agreement.

¶ 7. In March 1995, Sharp, the Scarberrys, and Lane entered into an employment agreement defining the terms and conditions of Lane's continued employment with Sharp. The employment agreement allowed Sharp to terminate Lane's employment for any reason with ninety days written notice. The agreement also provided that Lane maintained his position as Executive Vice President of Sharp, received the same compensation as Paul Scarberry, and was elected a director of Sharp's board of directors.[2] Lane was also given an equal voice in selecting Sharp's professional service providers and Lane, as well as Paul Scarberry, had veto power to discharge any professional failing to provide satisfactory performance. Furthermore, in recognition of Lane's service to Sharp, the employment agreement referenced a Stock Option Agreement and a Stock Transfer Restriction Agreement.

---

[2] Lane actually replaced John Niebler, then legal counsel to Sharp, as a member of Sharp's board of directors.

¶ 8. The Stock Option Agreement gave Lane the option to purchase a 25% stock ownership in Sharp. Until Lane exercised the option, the agreement provided that he shall have no rights as a shareholder of the company, but shall be given at least forty-eight hours notice of, and shall be entitled to be present at, any meeting at which action is to be taken by shareholders. If Lane chose not to exercise his stock option, and his employment was terminated before the agreement expired, the agreement provided that Lane would be paid a sum of money according to an appraisal formula in the agreement, based on the present stock value.[3]

¶ 9. During the time of Lane's employment, Sharp prospered. From October 1992, to October 1998, Sharp's gross sales more than doubled and shareholders' equity more than quadrupled. The company's value increased from approximately $1.8 million in 1992 to approximately $11 million by October 1995.

¶ 10. On March 2, 1999, Sharp terminated Lane's employment, effective May 31, 1999. Lane had not exercised his stock option at the time of his termination. Accordingly, on May 26, 1999, pursuant to the Stock Option Agreement, Lane elected to surrender his stock options and receive his lump sum stock appreciation rights payments. Pursuant to the appraisal formula and procedure laid out in the Stock Transfer Restriction Agreement, Sharp and the Scarberrys retained Theodore F. Gunkel of Madison Valuation Asso-

---

[3] Paragragh 6(a) of the Stock Option Agreement references the appraisal formula as the "Formula Price" determined under paragraph 9 of the Stock Transfer Restriction Agreement. Because the method of calculating the appraisal is not at issue here, we do not lay out the method used for valuation of the company's stock.

ciates to appraise the fair market value of Lane's stock appreciation rights. Lane received the appraisal in October 1999, which revealed that prior to Lane's termination, there was a distribution of profit to the shareholders. The appraiser concluded that the value of Lane's 25% interest in Sharp was $91,000. Lane disagreed with Gunkel's appraisal and retained Bryan Browning of Valuation Research Corp. to conduct an additional appraisal, as permitted under the parties' agreements.

B. Niebler's Relationship with Sharp and the Scarberrys

¶ 11. Since approximately 1985, Attorney John Niebler and his law firm, Niebler, Pyzyk, Klaver & Wagner, LLP (hereinafter "Niebler law firm"), have represented both Sharp and the Scarberrys in various legal matters. Since 1992, Niebler has advised Sharp and the Scarberrys about Sharp's employment agreements and relationship with Lane. At various times since 1994, Niebler and his law firm have also provided legal advice to Sharp and the Scarberrys about a proposed termination of Lane's employment with Sharp. Niebler and his law firm also did considerable legal work for Sharp regarding other matters. From at least 1995 through 1999, Niebler's firm sent monthly bills to Sharp, requesting payment and revealing the nature of legal services performed.

¶ 12. From 1993 to 1995, as Sharp's lawyer, Niebler served on Sharp's Board of Directors. Pursuant to Lane's 1995 employment contract with Sharp, Lane replaced Niebler on Sharp's board. In 1995, Sharp designated new corporate counsel, the law firm of Meissner & Tierney, replacing the Niebler law firm.

However, Niebler continued to represent the Scarberrys as their personal attorney.

¶ 13. In 1998, Niebler advised the Scarberrys about taking a corporate distribution from Sharp's accumulated profits. Niebler subsequently consulted with M&I Bank about a possible loan to Sharp to finance the distribution. In February 1999, the Scarberrys received a corporate distribution from Sharp in the amount of approximately $3,800,418.00, financed by a loan to Sharp from M&I Mortgage Corp. The distribution was made without any meeting of the Board of Directors and without Lane's knowledge. As stated previously, Lane had not exercised his stock options prior to the distribution. Furthermore, Lane was not aware of the distribution until he received Gunkel's appraisal in October of 1999.

## C. Trial Court Proceedings

¶ 14. On December 13, 1999, Lane filed suit against Sharp and the Scarberrys in Waukesha County Circuit Court, alleging fraudulent transfer, breach of his employment agreement, breach of the stock option agreement, civil conspiracy, request for an accounting, and request for declaratory and injunctive relief seeking to undo the actions taken by Sharp and the Scarberrys. Represented by Niebler and two other attorneys,[4] Sharp and the Scarberrys filed an answer to Lane's complaint. Sharp and the Scarberrys contended that Lane never exercised his stock option rights and that the distribution was valid.

---

[4] Robert Horowitz and Barbara A. Neider of Stafford Rosenbaum LLP, also represented Sharp and the Scarberrys.

¶ 15. During discovery, Lane subpoenaed documents from Niebler and his firm. Specifically, the subpoena duces tecum requested:

1. All bills submitted by Niebler, Pyzyk, Klaver & Wagner, LLP (hereinafter "Niebler") to Sharp Packaging Systems, Inc. (hereinafter "Sharp") for the period May 3, 1995 to May 31, 1999.

2. All charge records, day book records or other Documents* showing the date and/or time and/or work done by Niebler or any attorney associated with the firm of Niebler, Pyzyk, Klaver & Wagner with respect to services rendered for Sharp Packaging Systems, Inc. for the period May 3, 1995 to May 31, 1999.

3. All Documents representing communications by or between Sharp and/or the Scarberrys and/or Niebler regarding Harold C. Lane, Jr. (hereinafter "Lane") and/or any agreements with Lane for the period January 1, 1998 to the present.

4. All Documents relating to any loan or loan request for purposes of funding a shareholder distribution for Sharp shareholders for the period January 1, 1998 to May 31, 1999.

5. All Documents comprising or relating to any negotiations and/or proposals and/or letters of intent and/or offers for the sale or recapitalization of all or a portion of Sharp, or its stock, for the period January 1, 1998 to the present.

6. All Documents relating to the decision to distribute, or the distribution of, approximately $3,800,418 to the stockholders of Sharp in February or March, 1999, including but not limited

to all loan documents and communications relating to the source of any such funds.

*The word "Documents" is defined on the enclosed attachment to Exhibit A.

¶ 16. Sharp and the Scarberrys responded to Lane's subpoena of Niebler's documents with a motion for a protective order and to quash the subpoena duces tecum. Sharp and the Scarberrys argued that the documents requested are protected by the lawyer-client privilege and the work product doctrine. Lane argued that the subpoena fell within the crime-fraud exception to the lawyer-client privilege because his complaint sufficiently alleged fraudulent transfer. In a bench decision, the Honorable Kathryn W. Foster, denied the motion to quash and ordered the defendants to produce all documents previously withheld on both lawyer-client privilege and work product grounds. In her written decision, the circuit court ordered that the Niebler law firm provide:

(a) bills from the Niebler firm to Sharp and documents reflecting confidential communications between the Niebler firm and defendants shall be produced for the period through May 31, 1999; and

(b) non-privileged documents, including documents reflecting the Niebler firm's communications with third parties, shall be produced for the time periods requested by plaintiff.

When issuing the decision, the circuit court judge stated, "[t]here's a foul odor that comes from this file." With regard to the connection with the Niebler firm, the circuit court judge stated, "there were billings that were submitted to the corporation and under Mr. Lane's

85

obligations were reviewed by him but not retrievable .1y him upon his termination, I think he's entitled to examine them again with the benefit of counsel.' In finding the crime-fraud exception to the lawyer-client privilege applicable, the circuit court attributed "sinister motives" to the defendants' acts, stating:

> I'm satisfied that there is based on the Court's previous review of the Complaint, as well as the other limited information presented here, that there is a prima facie case. . . . the combination of the relationship that existed between the immediate parties already named in this case and that prima facie showing and the circumstances, the allegation of breach and of that agreement going on, not just immediately prior to the termination but perhaps for a time pre-dating that, a time in which the Niebler law firm was supposedly only providing limited . . . services [to Sharp] . . . that the totality of all those matters I believe allow the attorney-client privilege to be dissipated under the parameters that the Court has outlined here.

¶ 17. In addition to the subpoena duces tecum requesting documents from Niebler, Lane also served a subpoena duces tecum on third parties, including M&I Bank.[5] In response to the subpoena, Sharp and the Scarberrys again filed a motion for a protective order and to quash on the grounds that the documents were private and irrelevant. The circuit court denied the motion and also awarded Lane attorneys' fees on the motion. There was no breakdown on the fees between the two motions to quash, so the circuit court based the awarded fees on half of what was expended on the two motions. Specifically, the circuit court judge stated:

---

[5] We do not lay out the language of the subpoena because the substance of the subpoena duces tecum is not at issue.

The last matter I still want to get to is the plaintiff's request for costs pertaining to this motion. The Court will request a submission of what those costs are. But as far as the issue of the production of financial records, I am going to grant that request. As far as the matter of attorney-client privilege which I think present more difficult legal issues, I'll deny that. *My inclination simply is to cut it strictly in half and not require that you say how much I did on this part of the motion or that on the other, but I would award 50 percent of costs pertaining to all of the matters brought before the Court here today.*

(Emphasis added.)[6]

D. Appellate Court Proceedings

¶ 18. Sharp and the Scarberrys sought leave to file an interlocutory appeal on the circuit court's denial of the motions to quash Lane's subpoenas. The Court of Appeals granted review on an expedited schedule and also allowed John H. Niebler and Niebler, Pyzyk, Klaver & Wagner, LLP to intervene as additional appellants. Recognizing this case involves several issues of first impression, the Court of Appeals certified a por-

---

[6] Lane subsequently amended his complaint, adding Niebler and the Niebler law firm as party defendants. Niebler and his law firm filed a motion to dismiss. On March 1, 2001, the circuit court issued a written order dismissing all claims asserted against Niebler and his law firm. Issues involving that claim are not presently before this court.

tion[7] of the appeal to this court. We granted certification of all issues raised on appeal.

## II. DISCUSSION

¶ 19. We review the circuit court's discovery order for an erroneous exercise of discretion. *See Borgwardt v. Redlin,* 196 Wis. 2d 342, 350, 538 N.W.2d 581 (Ct. App. 1995); *Swan Sales Corp. v. Jos. Schlitz Brewing Co.,* 126 Wis. 2d 16, 28, 374 N.W.2d 640 (Ct. App. 1985). "The burden is on [the appellant] to show that the trial court misused its discretion and we will not reverse unless such misuse is clearly shown." *Konle v. Page,* 205 Wis. 2d 389, 393, 556 N.W.2d 380 (Ct. App. 1996). We will sustain a discretionary act if we find the trial court examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach. *Paige K.B. v. Steven G.B.,* 226 Wis. 2d 210, 233, 594 N.W.2d 370 (1999). Whether the circuit court utilized the proper legal standard, however, is a question of law we review independently of the circuit court, benefiting from its analysis. *See Three & One Co. v. Geilfuss,* 178 Wis. 2d 400, 410, 504 N.W.2d 393 (Ct. App. 1993).

¶ 20. Sharp and the Scarberrys argue that the circuit court erroneously exercised its discretion by denying their motion to quash the subpoena of Niebler's documents. They maintain that the documents re-

---

[7] The Court of Appeals' certification directly asked this court to address four issues. In a footnote, however, the Court of Appeals noted five other issues raised in the appeal. We granted certification of all issues raised in the Court of Appeals, not just the four issues directly addressed in the certification.

quested are protected either by the lawyer-client privilege or the work product doctrine. Lane argues the documents requested from Niebler either do not fall within the protection of the lawyer-client privilege or the work product doctrine, or the documents are exempt from privilege on several theories. We address each argument in turn.

A. Lawyer-Client Privilege

¶ 21. We first address whether the documents requested from Niebler are protected by the lawyer-client privilege. Wisconsin Stat. § 905.03 protects confidential communications between clients and their attorneys. Section 905.03(1)(d) defines a "confidential communication" as a communication "not intended to be disclosed to 3rd persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Wisconsin Stat. § 905.03(2) details the scope of the lawyer-client privilege:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.

In *State ex rel. Dudek v. Circuit Court,* 34 Wis. 2d 559,

580, 150 N.W.2d 387 (1967), we addressed the scope of privilege and held that "once the professional relationship is established, all communications, oral and written, between attorney and client are privileged from production excluding those exceptions outlined in the statute." The privilege belongs to the client and can only be claimed by the client or the lawyer at the time of the communication, on behalf of the client. Wis. Stat. § 905.03(3). The policy underlying this privilege is to ensure full disclosure by clients who feel safe confiding in their attorney. *See Jax v. Jax,* 73 Wis. 2d 572, 579, 243 N.W.2d 831 (1976) (citing *Jacobi v. Podevels,* 23 Wis. 2d 152, 156–157, 127 N.W.2d 73 (1964)); *Koeber v. Somers,* 108 Wis. 497, 504, 84 N.W. 991 (1901); *Dyson v. Hempe,* 140 Wis. 2d 792, 813, 413 N.W.2d 379 (Ct. App. 1987). Furthermore, because the lawyer-client privilege is " 'an obstacle to the investigation of the truth' it should be 'strictly confined within the narrowest possible limits consistent with the logic of the principle.' " *Jax,* 73 Wis. 2d at 579 (quoting *Jacobi,* 23 Wis. 2d at 157).

¶ 22. Sharp and the Scarberrys contend the circuit court erred because the documents requested by Lane fall directly within the protection of the lawyer-client privilege. On the other hand, Lane argues the documents fall outside the scope of the privilege for several reasons: (1) Lane, as a former officer of Sharp, was allowed to waive the privilege; (2) billing records are similar to fees and not subject to the lawyer-client privilege; (3) communications with third parties are not

protected; and (4) the crime-fraud exception applies.[8] We address each issue separately.

## 1. Lane's status as former director of Sharp

¶ 23. First, we examine whether Lane, as a former officer and director of Sharp, is entitled to documents from Sharp either because he can waive the lawyer-client privilege, or because as a corporate representative, he was entitled to the privileged communications at the time they were made, and the privilege survives his termination of employment.

¶ 24. Sharp, the Scarberrys, Niebler, and the Niebler law firm (hereinafter appellants) argue that the circuit court erred in ordering the discovery of documents from Niebler because according to the entity rule (the organization, not individual members, is the client), only Sharp can waive the lawyer-client privilege. Appellants urge this court to apply the entity rule here and find that Lane's status as a former director does not allow him to waive the lawyer-client privilege, and that

---

[8] Lane also argues that the documents are not privileged because the advice Niebler gave to Sharp was business advice rather than legal advice. Sharp and the Scarberrys urge this court to create guidelines and strengthen the presumption in Wisconsin that lawyers are hired for legal advice. We decline to address this issue because the circuit court's decision was not based on whether Niebler provided business or legal advice. In fact, the circuit court did not even address this argument. Because we are reviewing the reasons stated by the circuit court for its decision, we decline appellants' invitation to address this issue simply to strengthen the presumption that lawyers are hired for legal advice. *See United States v. Chen,* 99 F.3d 1495, 1501 (9th Cir. 1996) (presumption that a lawyer is hired to give legal advice is rebutted only "when the facts show that the lawyer was 'employed without reference to his knowledge and discretion in the law' ").

the current corporate representatives may effectively assert the lawyer-client privilege against Lane.

¶ 25. Appellants first rely on SCR 20:1.13(a), which states: "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." In *Jesse v. Danforth,* 169 Wis. 2d 229, 485 N.W.2d 63 (1992), this court discussed the entity rule expressed by SCR 20:1.13, holding that the organization, not the constituent, is the lawyer's client. We then applied the entity rule to privileged communication under SCR 20:1.6,[9] and held that the corporate entity, not the constituent,

---

[9] SCR 20:1.6 states in full: Confidentiality of information. (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b), (c) and (d).

(b) A lawyer shall reveal such information to the extent the lawyer reasonably believes necessary to prevent the client from committing a criminal or fraudulent act that the lawyer reasonably believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interest or property of another.

(c) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services had been used;

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

holds the privilege. Appellants contend that under the entity rule, only Sharp, not Lane, can waive the lawyer-client privilege.

¶ 26. In addition to relying on the entity rule and *Jesse,* appellants rely on *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343 (1985), for their position that even as a former director of Sharp, Lane may not waive the lawyer-client privilege and the present directors of Sharp may effectively assert the privilege against him. In *Weintraub,* the United States Supreme Court addressed "whether the trustee of a corporation in bankruptcy has the power to waive the debtor corporation's attorney-client privilege with respect to communications that took place before the filing of the petition in bankruptcy." 471 U.S. at 345. As part of an investigation of the Chicago Discount Commodity Brokers (CDCB) the Commodity Futures Trading Commission (hereafter the Commission) served a subpoena duces tecum upon CDCB's former counsel, Gary Weintraub. At his deposition, Weintraub refused to answer questions, asserting the lawyer-client privilege. The CDCB maintained that former officers, directors and employees no longer had authority to assert the privilege. Recognizing that corporations must act through agents, the Court discussed how control of the corporation is exercised through management and the effect of new management.

> New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former

---

(d) This rule does not prohibit a lawyer from revealing the name or identity of a client to comply with ss. 19.43 and 19.44, Stats. 1985–86, the code of ethics for public officials and employees.

> officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Weintraub,* 471 U.S. at 349. The Court noted that for solvent corporations, the corporation's management retains the power to waive the corporate lawyer-client privilege. *Id.* at 348. Therefore, because "the trustee plays the role most closely analogous to that of a solvent corporation's management" the Court held that the trustee retains control of the lawyer-client privilege. *Id.* at 353. Appellants urge this court to follow *Weintraub* and hold that because Lane is "now neither an officer nor a director . . . [he] retains no control over the corporation's privilege." *Id.* at 349 n.5.

¶ 27. Finally, appellants argue that the standard to determine if the lawyer-client privilege applies should be based on why the information is requested, not when the documents are prepared. Relying on *Milroy v. Hanson,* 875 F. Supp. 646 (D. Neb. 1995), appellants argue that whether the lawyer-client privilege can be invoked depends on whether the requesting officer or director attempting to acquire the privileged documents, is acting in his own capacity or as a representative of the corporation.

¶ 28. In *Milroy,* the United States District Court for the District of Nebraska, examined whether a director and minority stockholder of a corporation has the right to documents otherwise protected under the lawyer-client privilege. 875 F. Supp. at 646. The director brought suit against the corporation and remaining stockholders and directors seeking money damages and liquidation of the corporation. *Id.* The court focused on whether the corporation could assert the lawyer-client

privilege and prevent production of documents held by the corporation's accountants and lawyers. *Id.* at 647. The court examined case law from other jurisdictions, particularly *Kirby v. Kirby,* No. Civ. A. 8604, 1987 WL 14862 (Del. Ch. July 29, 1987), and cases relying on *Kirby.*[10] In *Kirby,* the Delaware Chancery Court reasoned that all directors are responsible for the proper management of the corporation and concluded that the lawyer-client privilege could not be asserted against a former director. 1987 WL 14862, at *6. The *Milroy* court disagreed with the *Kirby* reasoning:

> With all due respect, cases like Kirby, Harris, and Gottlieb make a fundamental error by assuming that for a corporation there exists a "collective corporate 'client' " which may take a position adverse to "management" for purposes of the attorney-client privilege. There is but one client, and that client is the corporation. This is true despite the fact that a corporation can only act through human beings. . . . A dissident director is by definition not "management" and, accordingly, has no authority to pierce or otherwise frustrate the attorney-client privilege when such action conflicts with the will of "management."

875 F. Supp. 646, 649–650 (citations omitted). The court held that under Nebraska law, the dissident director "has no right to waive or otherwise pierce [the corporation's] attorney-client privilege because he is not the 'management' of the corporation and 'management' of the corporation, as it has a right to do, asserts the privilege against him." *Id.* at 651. In this case, appellants contend that because Lane is a dissident

---

[10] *Harris v. Wells,* Nos. B-89–391 (WWE), B-89–482 (WWE), 1990 U.S. Dist. LEXIS 13215, 1990 WL 150445 (D. Conn. Sept. 5, 1990); *Gottlieb v. Wiles,* 143 F.R.D. 241 (D. Colo. 1992).

former director seeking privileged documents for personal gain, the lawyer-client privilege applies, it cannot be waived by Lane, and Sharp may effectively assert the privilege against him.

¶ 29. Lane argues that the documents requested from Niebler are not privileged because Sharp has not established the communications were for the purpose of obtaining legal advice. Even if the documents are privileged, however, Lane contends that Sharp cannot withhold privileged documents because he was an officer and director of Sharp during the time the requested communications were made. According to Lane, applying the entity rule does not solve this issue because he does not dispute that Sharp is the client. Rather, Lane argues that his right to the documents is based on his former status as director and a representative of the entity. Lane contends that *Milroy* and *Weintraub* are not on point because *Milroy* was principally a shareholder derivative suit and unlike here, the plaintiff did not contend he was entitled to corporate documents. According to Lane, *Weintraub* is inapplicable because the case focuses on who has the authority to assert or waive a corporation's lawyer-client privilege, and not whether a former director is entitled to discover documents to which he was entitled during his employment.

¶ 30. Instead of *Milroy* and *Weintraub,* Lane urges this court to follow *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* 1996 WL 307444 (Del. Ch. June 4, 1996),[11] because the facts are similar. In *Moore,*

---

[11] We recognize that Lane also cites other cases for his argument that a corporation may not invoke the lawyer-client privilege against a former officer or director of the corporation. *See Carnegie Hill Fin., Inc. v. Krieger,* No. 99–CV-2592, 2000 WL 10446 (E.D. Pa. Jan. 5, 2000); *Glidden Co. v. Jandernoa,* 173 F.R.D. 459 (W.D. Mich. 1997); *In re Hutchins,* 211 B.R. 330

the Court of Chancery of Delaware was faced with a situation where an attorney furnished legal advice about a purchase agreement and discussed strategies with all but one director. 1996 WL 307444, at *2. When the attorney was subsequently deposed, the corporation asserted the lawyer-client privilege. *Id.* Relying largely on Delaware case law, the court held that a corporation cannot assert the lawyer-client privilege to deny a director access to legal advice furnished to the board during the director's tenure. 1996 WL 307444, at *4. "Because the attorney-client privilege belongs to the client, it would be perverse to allow the privilege to be asserted *against* the client." *Id.* at *6 (emphasis in original). The court also noted that under Delaware law, the corporation had alternative means to enable its directors to receive confidential attorney advice not discoverable by the other director.[12] Based on *Moore,*

_____

(Bankr. E.D. Ark. 1997); *Resolution Trust Corp. v. Adams,* No. 93–389–CIV-ORL-18, 1994 WL 315646 (M.D. Fla. Apr. 14, 1994); *Gottleib v. Wiles,* 143 F.R.D. 241 (D. Colo. 1992); *AOC Ltd. P'ship v. Horsham Corp.,* Civ. A. No. 12480, 1992 WL 97220 (Del. Ch. May 5, 1992); *Kirby v. Kirby,* No. Civ. A. 8604, 1987 WL 14862 (Del. Ch. July 29, 1987). We note, however, that these cases are largely unpublished decisions and are only from Delaware and a few federal district courts. Rather than distinguishing all of these cases, we follow Lane's approach in his brief and address in detail only *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* Nos. 13911 and 14595, 1996 WL 307444 (Del. Ch. June 4, 1996).

[12] Specifically, the court found that the corporation could have bargained for the protection of confidential attorney advice in the Stockholders Agreement or could have acted pursuant to 8 Del.C. § 141(c). *Moore,* 1996 WL 307444, at *6. Under 8 Del.C. § 141(c), the corporation could appoint a special committee empowered to address the confidential issues. *Id.* Under either option, the special committee could have retained

Lane contends that the circuit court did not erroneously exercise its discretion and properly held that the information in Niebler's files was not protected by the lawyer-client privilege. Lane urges this court to hold that because he was entitled to the communications regarding the shareholder distribution when he was a director, he is entitled to the same communications in this litigation.

¶ 31. In reviewing the circuit court's decision, we note first that the circuit court did not directly rule on this specific issue. The court did not specifically address the legal issues the parties raise before this court regarding whether Lane's former status as a director allows him access to otherwise privileged communications. The circuit court judge's only comment on this issue was related specifically to billings,[13] but the court's ruling seemed to rely largely on Lane's former status as a director.

> There were (sic) a linking by contract of these parties during a significant period of time in which the Niebler law firm provided services to the Sharp Corporation. And if, in fact, there were billings that were submitted to the corporation and under Mr. Lane's obligations were reviewed by him but not retrievable by him upon his termination, I think he's entitled to examine them again with the benefit of counsel.

¶ 32. We conclude that the circuit court's ruling was an erroneous exercise of discretion. The circuit

---

separate legal counsel and the communications would be properly protected from disclosure under the lawyer-client privilege. *Id.*

[13] Whether attorney billings are protected by the lawyer-client privilege is a somewhat different issue and is discussed below in Section 2.

court did not directly address whether a former director is allowed to waive the lawyer-client privilege of the corporation, or whether the corporation is able to assert the lawyer-client privilege against a former director for documents prepared during the director's tenure. However, we recognize the circuit court had little guidance because this is an issue of first impression in Wisconsin.

¶ 33. Lane's status as a former director does not entitle him to access Niebler's files regarding communications with Sharp. Wisconsin follows the entity rule,[14] and accordingly, the lawyer-client privilege belongs to Sharp—Niebler's client—and only Sharp can waive the lawyer-client privilege. *See* Wis. Stat. § 905.03(3); *see also Dudek,* 34 Wis. 2d at 605 (only the client can waive the lawyer-client privilege); *Borgwardt,* 196 Wis. 2d at 355; *Swan Sales Corp.,* 126

---

[14] Even though *Jesse v. Danforth,* 169 Wis. 2d 229, 242, 485 N.W.2d 63 (1992), originally adopted and applied the entity rule in a conflict of interest case, we find it appropriate to rely on the entity rule here as well. As we recognized in *Jesse,* "the clear purpose of the entity rule was to *enhance the corporate lawyer's ability to represent the best interests of the corporation* without automatically having the additional and potentially conflicting burden of representing the corporation's constituents." *Id.* at 240 (emphasis added). Applying the entity rule here furthers this purpose, because it allows the corporate lawyer to focus on representing only the best interest of the client corporation. The corporation's lawyer does not need to worry about representing the interests of every member (or former member) of the corporation's board of directors. Accordingly, only the client corporation or the corporation's lawyer, acting on the corporation's behalf, can waive the lawyer-client privilege. We disagree with the dissent's interpretation that applying the entity rule makes the lawyer "become the corporation's guardian ad litem." Dissent at ¶ 85. Rather, we are merely applying the purpose of the entity rule as stated in *Danforth.*

Wis. 2d at 31–32. While a corporate client can only act through its officers, directors, employees, shareholders and other constituents, *see* Comment to SCR 20:1.13,[15] we logically conclude that a former director cannot act on behalf of the client corporation and waive the lawyer-client privilege.

¶ 34. We further conclude that even though the documents were created during Lane's tenure as a director, Lane is not entitled to the documents in Niebler's files. As the United States Supreme Court stated in *Weintraub,* "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." 471 U.S. at 348. The Scarberrys currently comprise Sharp's board of directors, or management, and retain control over Sharp's lawyer-client privilege. Lane is a former director, and a "dissident." We agree with the court's reasoning in *Milroy:* "A dissident director is by definition not 'management' and, accordingly, has no authority to pierce or otherwise frustrate the attorney-client privilege when such action conflicts with the will of 'management.' "[16] 875 F. Supp.

[15] The Comment to SCR 20:1.13 states in part: "An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents."

[16] While we decline appellants' request to ground application of the lawyer-client privilege on why the information is being requested, we find it significant that Lane is acting in his individual capacity and requests the documents for personal gain in his lawsuit against the corporation. Lane's status as former director does not entitle him to pierce the lawyer-client privilege in order to further his personal gain against the corporation.

646, at **13. Accordingly, we conclude that even though Lane is a former officer and director, and the documents at issue were prepared during his tenure, Sharp can effectively assert the lawyer-client privilege against him.[17]

---

[17] The dissenting opinion ignores the present facts, and instead bases its decision on the fact that Lane, when he was a member of the Sharp board of directors, could have acted on behalf of Sharp and waived the attorney-client privilege. Dissent at ¶ 80. Specifically, the dissent ignores that Lane, a "dissident," can no longer act on behalf of Sharp; only the current Sharp board of directors can waive the attorney-client privilege. Accordingly, and directly on point, the current board of directors, can, and has chosen to, not waive the attorney-client privilege in respect to the documents requested by Lane. To state this another way, the current board of directors has chosen to effectively assert the attorney-client privilege against Lane. Moreover, as discussed previously, it makes no difference to the attorney-client privilege that the documents Lane requested were prepared during his tenure with Sharp.

It also makes no difference if we note, as the dissent suggests, that Sharp is a closely held corporation. *See* dissent at ¶ 89. The dissent erroneously characterizes this situation as one where the Scarberrys and Lane retained a single attorney and later developed adverse interests. Dissent at ¶ 94. The dissent therefore concludes, "When the persons who joined together later develop adverse interests, they may not assert the attorney-client privilege against one another as the basis for withholding legal information developed during their joint undertaking." *Id.* (footnote omitted). In drawing this conclusion, the dissent ignores, however, several relevant facts. First, at all relevant times the Scarberrys have been the sole shareholders of Sharp. Second, the Scarberrys and Sharp first retained Attorney Niebler in 1985, but Lane did not join Sharp as executive vice president until 1992. Based on these facts, Niebler was involved with the Scarberrys and Sharp nearly seven years before Lane could claim that they "shared a

¶ 35. Finally, before addressing other issues involving the lawyer-client privilege, we note that our holding here is based strictly on the facts as presented. We rely largely on the fact that Lane is a former director. We specifically do not address, or speculate, on the outcome of any similar situations involving a current member of a board of directors.[18]

## 2. Attorney billing records

¶ 36. We next turn to appellants' argument that the circuit court erred in ordering production of the Niebler firm's billing records because attorney billing records are protected by the lawyer-client privilege. Appellants contend that production of attorney billing records would reveal the specific nature of legal services provided to Sharp and the Scarberrys, which is confidential information protected by the lawyer-client privilege.

¶ 37. Appellants rely on the distinction drawn in *In re Grand Jury Subpoena Issued to Horn,* 976 F.2d

---

common interest in the success of Sharp Packaging." Dissent at ¶ 92. We therefore find it wrong to characterize this situation as one where the Scarberrys and Lane, together, retained Niebler in order to pursue a common interest. Accordingly, we conclude that it makes no difference to our decision that Sharp is a closely held corporation. We reiterate that, as the current representatives of Sharp, the Scarberrys have chosen to assert the attorney-client privilege against Lane. Throughout the time period at issue, Lane was an officer and employee of Sharp, never a shareholder.

[18] Contrary to the dissent's suggestion that limiting the scope of our opinion to the facts presented "mean[s]" something, dissent at ¶ 74 n.2, we note that the decision is limited to the facts of this case because we conclude it would be inappropriate to speculate on issues not before this court.

1314, 1316–1317 (9th Cir. 1992), and *Real v. Continental Group, Inc.,* 116 F.R.D. 211, 213–214 (N.D. Cal. 1986), where the court distinguished billing records from fee arrangements, which are normally not protected. In both cases, the court found billing records protected by the lawyer-client privilege because production of these records would reveal the nature of legal services provided. *In re Grand Jury Subpoena,* 976 F.2d at 1318; *Real,* 116 F.R.D. at 214. Appellants argue that this case is similar because Niebler contends that the billing records at issue are more than just a bill for "services rendered" as they contain narrative descriptions of the legal services provided. Based on this reasoning, appellants contend the circuit court erroneously exercised its discretion by ordering production of the attorney billing records.

¶ 38. Lane argues he is entitled to the Niebler law firm billing records because when he was employed by Sharp, he was entitled to review attorney billing records. In other words, Lane contends that since he was entitled to review the billing records when they were originally sent to Sharp, he is entitled to see them as part of this litigation.

¶ 39. In ordering production of the Niebler firm's billing records, the circuit court stated: "And if, in fact, there were billings that were submitted to the corporation and under Mr. Lane's obligations were reviewed by him but not retrievable by him upon his termination, I think he's entitled to examine them again with the benefit of counsel." We conclude that the circuit court erroneously exercised its discretion in ordering production of the attorney billing records. The circuit court failed to examine the nature of the communications; specifically, it failed to note that the

103

billing records reveal the nature of legal services provided and the substance of lawyer-client communications. We recognize that this is an issue of first impression for this court, and we conclude that the circuit court's ruling was not based on a proper application of the legal principles involved.

¶ 40. While the lawyer-client privilege readily protects statements from the client to the lawyer, the privilege only protects communications from the lawyer to the client if "disclosure of the lawyer-to-client communications would directly or indirectly reveal the substance of the client's confidential communications to the lawyer." *Journal/Sentinel v. Sch. Dist. of Shorewood,* 186 Wis. 2d 443, 460, 521 N.W.2d 165 (Ct. App. 1994). Billing records are communications from the attorney to the client, and producing these communications violates the lawyer-client privilege if production of the documents reveals the substance of lawyer-client communications. *See Dyson,* 140 Wis. 2d at 815 (answer may not be compelled to inquiries that threaten to reveal the substance of lawyer-client communications).

¶ 41. According to Niebler's affidavit, which is uncontested,[19] the attorney billing records disputed

---

[19] We find it significant that Lane does not contest Niebler's affidavit regarding the contents of the billing records sent from Niebler's law firm to Sharp. In his brief at pages 41–42, Lane states:

[It] is *undisputed that [Lane] was entitled to review Niebler's legal bills* while plaintiff was employed by Sharp. Sharp argued below that plaintiff "must have known" about Niebler's services because plaintiff was in charge of Sharp's accounting operations, and Niebler's monthly bills were sent to and reviewed by Sharp's corporate controller, who reported to [Lane]. . . . Especially since Sharp affirmatively contends *[Lane] either did review or could have reviewed Niebler's bills while plaintiff was employed by*

here contain detailed descriptions of the nature of the legal services rendered to Sharp. Producing the attorney billing records would, therefore, reveal the substance of lawyer-client communications between Sharp and Niebler. Accordingly, we conclude that the attorney billing records are protected by the lawyer-client privilege. Again, we note that our holding is limited by the particular facts presented before this court. We decline to establish a broad rule that all attorney billing records are protected by the lawyer-client privilege. Rather, we focus only on the billing records in this case. We do not determine that all other attorney billing records or invoices are privileged, nor do we address whether the circuit court should conduct an in camera review in cases where the parties dispute whether billing records reveal the substance of lawyer-client communications.

3. Communications with Third Parties

¶ 42. Sharp and the Scarberrys next argue that the circuit court erred in ordering production of documents from Niebler involving communications with third parties. Sharp and the Scarberrys contend that the circuit court's ruling sacrifices confidentiality for

*Sharp,* the trial court properly ruled that Sharp may not assert privilege against plaintiff to deny him discovery of billing records in this litigation (emphasis added).

Faced with the opportunity, Lane does not dispute, but actually relies on Sharp's argument that Lane either did review, or could have reviewed, Niebler's bills sent to Sharp. The record, therefore, reflects that Lane could have contested, with his own affidavit, Niebler's representation that the attorney billing records contain detailed descriptions of the nature of legal services, and, therefore, production would violate the lawyer-client privilege.

105

efficiency, and that Lane has made no showing that he was unable to obtain these documents from third parties.

¶ 43. Lane argues that the circuit court's decision was within the court's discretion, because Niebler's correspondence with third parties is relevant and not within the scope of the lawyer-client privilege. Lane argues that Sharp, the party alleging privilege, bears the burden of showing good cause as to why the requested documents should not be produced. Furthermore, Lane contends it is imperative that he obtains discovery from all involved parties, in order to compare notes and piece together circumstantial evidence of fraud.

¶ 44. During the oral decision denying Sharp's and the Scarberry's motion to quash, the circuit court judge stated:

> There is an offer here that this kind of information may be available from third parties, but there's also documentation by way of the excerpts from depositions here that that was denied the plaintiff in the normal course of those depositions. And that being the case, it may be that there are other sources of this same information, but it occurs to this Court that the most efficient way of obtaining them is through the Niebler law firm file.

Furthermore, in the written order, the circuit court required production of all "non-privileged documents, including documents reflecting the Niebler firm's communications with third parties" for the time period Lane requested.

¶ 45. We conclude that the circuit court did not erroneously exercise its discretion on this issue. The circuit court judge carefully examined the situation

and, significantly, found that there was evidence that plaintiff was denied the requested information in the normal course of depositions. More importantly, however, is the fact that the circuit court ordered production of only *non-privileged* documents. Accordingly, documents protected by the lawyer-client privilege, or the work product doctrine, were not part of the circuit court's order regarding this issue. We, therefore, conclude that the circuit court's decision does not reflect an erroneous exercise of discretion, because the court examined the relevant facts, applied the proper standard of law, and reached a reasonable conclusion based on a demonstrative rational process. *See Paige K.B.,* 226 Wis. 2d at 233.

### 4. Crime-Fraud Exception

¶ 46. Appellants' final argument regarding the lawyer-client privilege is that the circuit court erred by concluding that the crime-fraud exception in Wis. Stat. § 905.03(4)(a)[20] applies, because Lane failed to make out a prima facie case of fraud, and the circuit court failed to conduct an in camera review prior to reaching the conclusion as to the applicability of the exception. We first address whether Lane made out a prima facie case, and then turn to whether the circuit court erred by failing to conduct an in camera review.

¶ 47. Relying on *Dyson v. Hempe,* 140 Wis. 2d 792, 413 N.W.2d 379 (1987), appellants first argue that

---

[20] Wisconsin Stat. § 905.03(4)(a) provides that there is no privilege "[i]f . . . the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."

Lane's allegations of fraud in the complaint are insufficient to establish a prima facie case. "The mere charge of fraud or illegality will not, however, 'set the confidences free.' " *Dyson,* 140 Wis. 2d at 804 (quoting *Clark v. United States,* 289 U.S. 1, 15 (1933)). The test for invoking the crime-fraud exception is whether there is "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir. 1996) (citations omitted). According to appellants, Lane has failed to meet this threshold requirement, because he has failed to provide any evidentiary facts supporting his position that services of the Niebler law firm were utilized in furtherance of fraud.[21] Finally, appellants contend that Lane has alleged only a breach of contract case, not actionable fraud.

¶ 48. Lane contends that the circuit court did not erroneously exercise its discretion in determining that a prima facie case of fraud was made. According to Lane, the complaint sufficiently alleges fraudulent transfer, the circuit court properly considered substantial evi-

---

[21] Niebler and the Niebler law firm additionally contend that this case addresses an "inherent conflict" between Wis. Stat. § 905.03(2) and (4) and SCR 20:1.2 and SCR 20:1.6. They argue that these statutes and Supreme Court Rules create a conflict between an attorney's obligation to comply with court orders, and the Supreme Court rules requiring attorneys to "abide by a client's decisions concerning the objectives of representation." SCR 20:1.2(a). According to Niebler, because Sharp, the Scarberrys and Niebler deny participation in any fraudulent activity, Niebler faces an inherent conflict and must choose between violating his obligation to his client, and being found in contempt for refusing to comply with the circuit court's discovery order. We decline to address Niebler's "inherent conflict" argument, because we do not uphold the circuit court's application of the crime-fraud exception to the lawyer-client privilege.

dence of fraud, and the record also establishes prima facie evidence that the intent of the distribution was to hinder Lane's rights as an equity holder. Among other things, Lane bases his argument on the fact that the $3.8 million distribution was not legal, because neither Sharp's by-laws nor the Wisconsin Statutes grant the right to receive shareholder dividends without a declaration by the board of directors. Based on the Stock Transfer Restriction Agreement, the only alteration to the requirement of a board of directors' declaration is that which allows for distribution of dividends to pay income taxes, but nothing more. Lane contends that the board meeting requirement was an express requirement intended to protect his 25% interest in Sharp. Lane further argues that this is not merely a breach of contract case, and that he has established a claim for fraudulent conveyance under Wis. Stat. § 242.01(4). Furthermore, the fact that Lane's status as a creditor derives from a contract, is immaterial. *See, e.g., Marshall & Ilsley Bank v. Stepke,* 228 Wis. 39, 279 N.W.2d 625 (1938) (recognizing mortgagee as creditor under fraudulent conveyance statute). Finally, Lane argues that the record contains ample evidence of Niebler's involvement in furthering the fraudulent scheme to distribute the profits only to the Scarberrys. According to Lane, Niebler encouraged the distribution to occur before Lane exercised his stock options, and, acting on behalf of Sharp, Niebler applied for and negotiated the M&I Mortgage Co. loan to finance the distribution. Examined together, Lane argues that the complaint and the record provide more than adequate evidence to satisfy his burden of making a prima facie case of fraud.

¶ 49. In finding that Lane had established a prima facie case of fraud, the circuit court relied on the

allegations in the complaint and the limited evidence in the record. The circuit court judge stated:

> I'm satisfied that there is based on the Court's previous review of the Complaint, as well as the other limited information presented here, that there is a prima facie case. . . . [T]he combination of the relationship that existed between the immediate parties already named in this case and that prima facie showing and the circumstances, the allegation of breach and of that agreement going on, not just immediately prior to the termination but perhaps for a time pre-dating that, a time in which the Niebler law firm was supposedly only providing . . . limited services pertaining to the industrial bond issue, that the totality of all those matters I believe allow the attorney-client privilege to be dissipated under the parameters that the Court has outlined here.

¶ 50. We conclude that the circuit court did not erroneously exercise its discretion in finding that Lane established a prima facie case of fraud. While we recognize that the mere allegation of fraud is insufficient, we note that the burden is low in that "[t]o drive the privilege away, there must be 'something to give colour to the charge.'" *Dyson,* 140 Wis. 2d 792, 804 (quoting *Clark v. United States,* 289 U.S. 1, 15 (1933)); *see also, United States v. Zolin,* 491 U.S. 554, 571 (1989) ("[A] lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege.") In order to establish a prima facie case, Lane must only show "reasonable cause to believe [Niebler's] services were utilized in furtherance of the ongoing unlawful scheme." *Chen,* 99 F.3d at 1503. "Reasonable cause is more than suspicion but less than a preponderance of evidence." *Id.*

110

¶ 51. Under this standard, Lane needs only submit evidence that, if believed, would establish an "ongoing unlawful scheme." *Id.* We conclude that the complaint, combined with evidence in the record (deposition testimony and affidavits)—demonstrating, among other things, Niebler's involvement with the distribution, and the lack of approval by the board of directors—are sufficient to establish a prima facie case of fraud. The circuit court's conclusion, therefore, will be upheld, because it is consistent with the facts in the record and established legal principles.

¶ 52. We next address appellants' argument that the circuit court erred in failing to conduct an in camera review to determine whether the crime-fraud exception applies. Sharp and the Scarberrys argue that even if the circuit court correctly concluded that Lane established a prima facie case of fraud, the court erred by failing to conduct an in camera review of the disputed documents. According to Sharp and the Scarberrys, an in camera review is the proper procedure to determine whether the crime-fraud exception applies because it is a smaller intrusion on lawyer-client confidentiality than public disclosure, and ensures that the circuit court's decision regarding the crime-fraud exception is an informed one.

¶ 53. Lane contends an in camera review is unnecessary, because the purpose of an in camera review is to resolve privilege disputes. Lane again asks this court to adopt a rule that Sharp cannot assert the lawyer-client privilege against a former director, making Lane entitled to discover all documents requested. Accordingly, an in camera review to determine whether specific documents are privileged would be unnecessary, because Lane would be entitled to discover all such documents.

111

¶ 54. Lane also contends that Sharp and the Scarberrys have waived their right to an in camera review by simply asserting a blanket claim of privilege (both attorney-client privilege and work product). Lane relies on *Holifield v. United States,* 909 F.2d 201, 204 (7th Cir. 1990), where the Seventh Circuit Court of Appeals refused to address the merits of the alleged lawyer-client privilege because Holifield failed to properly raise the issue. The court held that "brief conclusory summations" as to why documents are protected were insufficient to support a claim of the lawyer-client privilege. *Id.* We conclude that the holding in *Holifield* is inapplicable here for two reasons. First, Sharp and the Scarberrys have submitted more than "brief conclusory summations" as to why the lawyer-client privilege and the work product doctrine apply. While we might have preferred that they submit a privilege log, asserting the privilege on a document-by-document basis, we do not find that failure to do so in this case warrants denying Sharp and the Scarberrys an in camera review. By asserting that the circuit court erred in this case, Sharp and the Scarberrys are basically disputing all of the documents that would fall within the discovery order. Based on this conclusion, we do not find unreasonable Sharp and the Scarberry's choice to appeal the circuit court's entire decision. Second, contrary to Lane's assertion that Sharp and the Scarberrys have made no good-faith effort to produce documents, after reviewing the record, we conclude that Sharp and the Scarberrys have produced numerous documents in this case. Accordingly, we conclude that this is not a situation where Sharp and the Scarberrys are shirking their responsibility to provide discovery by making "blanket allegations" of privilege. We, therefore, reject Lane's argu-

112

ment that Sharp and the Scarberrys have waived their right to an in camera review.

¶ 55. Regarding the merits of the circuit court's decision not to conduct an in camera review, we conclude that the circuit court erroneously exercised its discretion. The circuit court simply determined that a prima facie case of the crime-fraud exception had been established, and did not examine any documents to determine if the crime-fraud exception actually applied. "It must do so." *Borgwardt*, 196 Wis. 2d at 357 (remanding for in camera review). As discussed previously, the burden to establish a prima facie case is low. Once the circuit court determines the prima facie case has been established, an in camera review is the proper procedure to determine if the crime-fraud exception to the lawyer-client privilege applies. *See George v. Record Custodian*, 169 Wis. 2d 573, 582, 485 N.W.2d 460 (Ct. App. 1992) (instructing trial court to conduct in camera inspection to determine if lawyer-client privilege applies). An in camera review is appropriate, because it is a "smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure." *Zolin*, 491 U.S. at 572.

¶ 56. While the decision to conduct an in camera review is a discretionary decision, we conclude that, in this case, the circuit court erroneously exercised its discretion. In *United States v. Zolin*, 491 U.S. 554, 572 (1989), the United States Supreme Court discussed factors a trial court should consider in deciding whether to conduct an in camera review.

> The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the dis-

trict court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

Here, the circuit court did not consider any of these factors in deciding it would not conduct an in camera review. Rather, the circuit court simply used the prima facie case to "allow the attorney-client privilege to be dissipated." An in camera review is appropriate in this case. Only by reviewing the documents at issue is the circuit court able to determine whether Niebler's legal services were rendered in furtherance of fraud. Upon remand, therefore, we instruct the circuit court to conduct an in camera review of the disputed documents to determine the applicability of the crime-fraud exception to the lawyer-client privilege.[22]

## B. Work Product Doctrine

¶ 57. In addition to the lawyer-client privilege, Sharp and the Scarberrys contend that documents Lane requested from Niebler are protected by the work product doctrine. Appellants argue that the circuit court erroneously exercised its discretion by concluding that, prior to May 31, 1999, litigation was not imminent, and documents prepared during that time are not protected by the work product doctrine. Appellants

---

[22] In determining that the crime-fraud exception is applicable, it is not intended that the circuit court invade the province of the jury to determine the claim of fraudulent transfer. Rather, the circuit court is only to make an evidentiary ruling that documents cannot be withheld from production based on the lawyer-client privilege.

contend that Lane had standing to sue Sharp since the date he was informed of his termination, March 2, 1999, and that litigation was anticipated as early as 1998. Based on these circumstances, appellants argue that documents prepared or obtained as early as 1998 are protected by the work product doctrine.

¶ 58. Niebler and his law firm further contend that Lane has not satisfied the burden to overcome the protection of the work product doctrine. Specifically, Niebler argues that under Wis. Stat. § 804.01(2)(c),[23] *State ex rel. Dudek v. Circuit Court,* 34 Wis. 2d 559, 585, 150 N.W.2d 387 (1967), and *Hickman v. Taylor,* 329 U.S. 495, 511–512 (1947), Lane has failed to meet his burden of showing that production of the documents is necessary to the preparation of his case, or that nonproduction would cause prejudice or hardship.

---

[23] Wisconsin Stat. § 804.01(2)(c) provides:

> (2) Scope of Discovery. Unless otherwise limited by order of the court in accordance with the provisions of this chapter, the scope of discovery is as follows:
>
> . . . .
>
> (c) Trial preparation: materials. 1. Subject to par. (d) a party may obtain discovery of documents and tangible things otherwise discoverable under par. (a) and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the party seeking discovery is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

¶ 59. Lane argues that the circuit court's decision was not an erroneous exercise of discretion, because litigation was not imminent until Lane's employment was officially terminated on May 31, 1999. Lane further argues that appellants bear the burden of proving the documents were made in anticipation of litigation, and Niebler's conclusory affidavit is insufficient to meet that burden.

¶ 60. We again review the circuit court's discovery order under the erroneous exercise of discretion standard. *See Borgwardt*, 196 Wis. 2d at 350. In deciding that documents prepared prior to May 31, 1999, are not protected by the work product doctrine, the circuit court judge stated:

> . . . I certainly can accept at face value, Mr. Niebler's representation and by way of affidavit that whenever work is done, certainly the potential for litigation exists. Where [sic] in a litigious society in dealing with corporate entities certainly the possibility of litigation is always there, but the key is, the fact that when it is imminent, and I think under the circumstances here that test is not met until after the actual termination of Mr. Lane occurred and went into full force and effect. And he in effect had standing to bring a lawsuit such as we have here before the Court today.

¶ 61. The work product doctrine was adopted in Wisconsin in *Dudek*, and codified by Wis. Stat. § 804.01(2)(c).[24] Unlike the lawyer-client privilege, the work product doctrine is a "qualified privilege." *Borgwardt*, 196 Wis. 2d at 353–354 (quoting *United States v. Nobles*, 422 U.S. 225, 237–238 (1975)). The

---

[24] The work product doctrine announced in *State ex rel. Dudek v. Circuit Court*, 34 Wis. 2d 559, 150 N.W.2d 387 (1967), is unaffected, however, by the enactment of Wis. Stat. § 804.01.

work product doctrine only "gives way 'upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the party seeking discovery is unable without undue hardship to obtain the substantial equivalent of the materials by other means.' " *Id.* at 354 (quoting Wis. Stat. § 804.01(2)(c)1.); *see also Dudek,* 34 Wis. 2d at 591 ("[T]he work product of the lawyer usually is privileged and not subject to discovery except where the objectives of pretrial discovery are unnecessarily frustrated and where good cause is shown to make exception to the rule."). Furthermore, in order to be covered by the work product doctrine, litigation has to be anticipated, but not already commenced. *Borgwardt,* 196 Wis. 2d at 354. "[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* (quoting 8 C.A. Wright, A.R. Miller, & R.L. Marcus, *Federal Practice and Procedure:* Civil 2d § 2024 at 343 (1994) (interpreting Fed. R. Civ. P. 26(b)(3), the federal analogue to Wis. Stat. § 804.01(2)(c))); *see also Meunier v. Ogurek,* 140 Wis. 2d 782, 788, 412 N.W.2d 155 (Ct. App. 1987) (interpreting Wis. Stat. § 804.01(2)(c)1 by using federal decisions construing the procedural counterpart). Finally, in *Dudek,* this court laid out what is necessary to overcome the protection of the work product doctrine.

> [O]nce a matter is classified as work product the court will require the party moving for discovery to make an adequate showing that the information contained in the work product is unavailable from other sources and

---

*Meunier v. Ogurek,* 140 Wis. 2d 782, 789, 412 N.W.2d 155 (Ct. App. 1987) (citing Judicial Council Committee's Note, 1974, 67 Wis. 2d at 659).

> that a denial of discovery would prejudice the movant's preparation for trial. What showing of unavailability or prejudice the court will require depends upon the particular facts and issues of the case, as well as what is deemed to be [the] basis for classifying the particular item as work product.

*Dudek,* 34 Wis. 2d at 591.

¶ 62. We conclude that the circuit court erroneously exercised its discretion by simply concluding that all documents prepared or obtained prior to May 31, 1999, are not covered by the work product doctrine. It is not apparent that the circuit court applied the test from *Dudek* and *Borgwardt.* We recognize that application of the work product doctrine is "a question of fairness tempered by the basic concepts of our adversary system and the desirable aspects of pretrial discovery." *Dudek,* 34 Wis. 2d at 592. However, the circuit court's decision does not reflect a finding that Lane made a showing of substantial need for the documents, there is no determination that the documents were prepared or obtained because of the "prospect of litigation," and although the circuit court's decision includes discussion about other sources of the information, the circuit court concluded, "the most efficient way of obtaining them is through the Niebler law firm." Because the circuit court failed to apply the correct legal standard, and did not examine the documents to determine whether the work product doctrine applies, we conclude that the circuit court's decision was an erroneous exercise of discretion. On remand, we direct the circuit court to apply the *Dudek* and *Borgwardt* standard and conduct an in camera review of the disputed documents. As discussed previously with regard to applicability of crime-fraud exception to the lawyer-client privilege, an in camera

118

review is the proper procedure for determining whether the claimed privilege applies. *See Borgwardt,* 196 Wis. 2d at 357–358 (citing *United States v. Zolin,* 491 U.S. at 568–569).

## C. Attorneys' Fees and Costs

¶ 63. We now turn to Sharp's and Scarberry's final argument that the circuit court's award of costs, including attorneys' fees was an erroneous exercise of discretion and violated Wis. Stat. § 804.12.[25] On June 5, 2000, the court heard defendant's motion for a protective order and to quash the subpoena concerning the Niebler firm's files, and defendant's motion for a protective order and to quash the subpoena regarding the scope of Lane's discovery of Scarberry's personal financial records from M&I Bank. The circuit court denied both motions. Pursuant to § 804.12, Lane filed a motion for an award of costs, including attorneys' fees in connection with both motions. The circuit court denied Lane's attorneys' fees motion regarding the Niebler firm's files, but granted Lane's motion for attorneys' fees regarding the personal financial records. In an oral ruling (as noted earlier), the circuit court judge stated:

> The last matter I still want to get to is the plaintiff's request for costs pertaining to this motion. The court will request a submission of what those costs are. But as far as the issue of the production of financial records, I am going to grant that request. As far as the matter of attorney-client privilege which I think presents a more difficult legal issue, I'll deny that. My inclination simply

---

[25] Wisconsin Statute § 804.12(1)(c)3. provides: "If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner."

is to cut it strictly in half and not require that you say how much I did on this part of the motion or that on the other, but I would award 50 percent of costs pertaining to all of the matters brought before the Court here today.

¶ 64. Sharp and the Scarberrys argue that the circuit court erred by simply cutting the attorneys' fees in half. They contend that the circuit court's decision was arbitrary and unreasonable in violation of Wis. Stat. § 804.12.

¶ 65. Lane contends the circuit court's decision was well within its discretion. The two motions were briefed and argued simultaneously, and it would have been difficult to segregate the time spent on each individual motion. Lane, therefore, argues that it was logical for the court to simply split the attorneys' fees in half because it was a method of avoiding prolonged allocation arguments.

¶ 66. We review the circuit court's award of attorneys' fees under the erroneous exercise of discretion standard. *Hughes v. Chrysler Motors Corp.,* 197 Wis. 2d 973, 987, 542 N.W.2d 148 (1996). We conclude that the circuit court did not erroneously exercise its discretion by awarding half of the costs, including attorneys' fees, pertaining to both motions. The circuit court reviewed the circumstances and determined the proper solution was to avoid any prolonged argument regarding costs and fees, and divide the costs and fees in half. Based on the record, we conclude that the circuit court's award of costs, including attorneys' fees, was reasonable and not an erroneous exercise of discretion.

## III. CONCLUSION

¶ 67. In summary, we have reviewed the circuit court's discovery orders under the erroneous exercise of discretion standard. We first examined the circuit court's conclusion that documents requested from Niebler and his law firm are not protected under the lawyer-client privilege. First, based on the entity rule and the reasoning in *Milroy,* we concluded that Lane's status as a former director does not allow him to waive the lawyer-client privilege, nor does it preclude Sharp's current board of directors from asserting the lawyer-client privilege against him. Second, we concluded that because Niebler firm's billing records reveal the nature of legal services provided, the billing records are protected by the lawyer-client privilege. Third, we concluded that the circuit court did not erroneously exercise its discretion in ordering production of non-privileged documents reflecting communications with third parties. Finally, we addressed the circuit court's application of the crime-fraud exception to the lawyer-client privilege. We concluded that while the circuit court did not err in finding that Lane established a prima facie case, the circuit court's failure to conduct an in camera review was an erroneous exercise of discretion. Accordingly, on remand, we instruct the circuit court to conduct an in camera review of the disputed documents and determine whether the crime-fraud exception is applicable.

¶ 68. In addition to lawyer-client privilege issues, we examined the circuit court's order regarding the application of the work product doctrine. We concluded that the circuit court's decision was an erroneous exercise of discretion. The circuit court failed to apply the correct test from *Dudek* and *Borgwardt* to determine whether Lane made a showing of substantial need for

the documents, and that he is unable, without undue hardship, to obtain the materials by other means. Furthermore, the circuit court did not conduct an in camera review and determine whether the documents were prepared or obtained because of the prospect of litigation. Accordingly, on remand, we instruct the circuit court to apply the *Dudek* and *Borgwardt* standard and conduct an in camera review of the disputed documents.

¶ 69. Finally, we reviewed the circuit court's award of costs, including attorneys' fees. We concluded that the circuit court's award of half the costs was reasonable and not an erroneous exercise of discretion.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded.

¶ 70. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). This case involves the questions of who is the client and who speaks for the client when a corporation claims an attorney-client privilege. More specifically, the question presented in this case is whether Lane, a former director in a closely held corporation, may have access to documents created during his tenure as a director of the corporation when the corporation's current board of directors asserts the corporation's attorney-client privilege to those documents. The majority opinion concludes that the current directors decide whether to waive the attorney-client privilege. I conclude that the corporation does not have an attorney-client privilege in the present case.

¶ 71. Sharp Packaging is a closely held corporation composed of two shareholders, Mr. and Mrs. Scarberry. Pursuant to an employment agreement, Lane was given extensive powers and interests in the corporation. Although not a shareholder of the corporation,

Lane was entitled to notice of shareholder meetings and to be present at those meetings. He was given stock options and stock appreciation rights. He had the power to veto or discharge any professional who was not performing to his satisfaction. He exercised that power to terminate Attorney Niebler's employment as Sharp Packaging's corporate counsel. Nevertheless, at the Scarberrys' request, Attorney Niebler apparently continued to provide Sharp Packaging with legal advice. Attorney Niebler also continued to bill Sharp Packaging for his services. At least some of Attorney Niebler's advice to the corporation was kept secret from Lane while Lane was a director of the corporation.

¶ 72. The guiding principle in this case, which the majority opinion explicitly recognizes at ¶ 21, is that the attorney-client privilege can be an obstacle to the investigation of the truth and should be strictly confined within the narrowest possible limits consistent with the logic of the principle. Unfortunately, the majority opinion fails to adhere to this principle. Instead, the majority opinion permits the current board of directors to use the attorney-client privilege to block a former director from inspecting documents to which the former director had access during his tenure and that might contain evidence of wrongdoing.

¶ 73. I agree with much of the majority opinion. But unfortunately the bulk of the opinion does not support the ultimate conclusion the majority reaches.

¶ 74. For example, I agree with the majority opinion that if a corporation's attorney-client privilege is to be waived, only the current corporate directors, not past corporate directors, have the power to waive that

privilege.[1] I also agree with the majority opinion that under the entity rule, the attorney-client privilege belongs to the corporation, and only the corporation can waive the privilege.[2] The corporate entity must, of course, act through a person or persons to carry out its many functions, including waiving or asserting the attorney-client privilege.

¶ 75. But these conclusions, embodied in the majority opinion, are not helpful in resolving the present case. Lane does not seek to waive the corporation's attorney-client privilege. The issue presented is not who can waive the privilege, but whether the current directors, the Scarberrys, can claim an attorney-client privilege against Lane, a former director.

¶ 76. Does a corporation have an attorney-client privilege that it may assert against a former director as to corporate records developed during the former director's tenure? The majority opinion does not answer

---

[1] Majority op. at ¶¶ 33–34; *Commodities Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 349 (1985).

[2] Majority op. at ¶ 33; *Jesse v. Danforth,* 169 Wis. 2d 229, 239–41, 485 N.W.2d 63 (1992).

*Jesse* is not on point and the majority's reliance on it is misplaced.

The majority opinion expressly declines to address the question of whether a current member of a board of directors in a situation similar to the one presented here can acquire legal advice secretly provided to the corporation. Majority op. at ¶ 35. What does this mean when the majority opinion explicitly states, without qualification, that a dissident director has no authority to frustrate the attorney-client privilege, majority op. at ¶ 34, citing *Milroy v. Hanson,* 875 F. Supp. 646, 649 (D. Neb. 1995), in which a current director was denied access to legal documents?

this question. It merely states that the current directors determine whether an attorney-client privilege can be waived.[3]

¶ 77. Wisconsin corporate law makes clear that directors are entitled to receive communications from the corporation's lawyer. Wisconsin law requires corporations to have a board of directors. Wis. Stat. § 180.0801(1) (1999–2000). All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, the board of directors, § 180.0801(2). Directors' meetings must be held and all directors must be given an opportunity to participate in the meetings, § 180.0820–0824. A board of directors may authorize committees, which in turn may exercise the authority of the board, including the employment of counsel, § 180.0825(1). The creation of a committee does not relieve the board of directors or any of its members of any responsibilities imposed on the members or the board, § 180.0825(7). The board of directors is entitled to rely on information prepared by legal counsel, § 180.0826(2). Thus, Wisconsin corporate law recognizes that the board of directors is entitled to legal information.

¶ 78. Most important for the present case, the board of directors has the authority to determine whether and in what amount to declare shareholder

---

[3] I agree with *Gottlieb v. Wiles,* 143 F.R.D. 241, 247 (D. Colo. 1992): "The fact that former officers and directors lack the power to waive the corporate privilege does not resolve the question of whether they themselves are precluded by the attorney-client privilege or work product doctrine from inspecting documents generated during their tenure. There is a surprising dearth of authority on this subject."

dividends, § 180.0640(1). Yet the distribution to the shareholders in the present case was made without a prior meeting of the board of directors, without notice to director Lane, without Lane's knowledge, and with the advice of counsel paid with corporate funds. And therein lies a basis for this lawsuit.

¶ 79. I conclude that under Wisconsin corporate law, Lane was entitled to have access to legal advice that Attorney Niebler rendered to the corporation during Lane's tenure as director, especially with respect to the $3.8 million dividend that is at issue in the present case. Indeed, the very reason Lane was a member of the board of directors was to protect his interest in the corporation by assuring that no shareholder distributions would be made without his knowledge and consent.

¶ 80. When I apply the entity theory to this case, I reach a different result from the majority. Applying the entity theory and Chapter 180 of the Wisconsin Statutes governing business corporations to the present case means that the client is the corporate entity; the corporate entity can act only through people; the directors are the collective body that has the responsibility to manage the corporation; and consistent with their joint obligations, the directors are the joint clients when legal advice is given to the corporation through one of its officers or directors.[4] Lane was part of the collective body and was, therefore, entitled to have access to the legal advice Sharp Packaging received during Lane's tenure on the board. This legal information cannot be privileged against Lane. An attorney may not withhold legal advice from his or her own client. The majority

---

[4] *Kirby v. Kirby,* No. Civ. A. 8604, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987).

opinion's position holds otherwise and allows the corporate entity of Sharp Packaging to assert the client's privilege against Lane, who was a member of the board and who was therefore also the client—a result that one court labeled "perverse."[5]

¶ 81. Wisconsin courts often look to Delaware law for guidance on matters of corporate law.[6] I reach the same result on the issue presented as that reached by the Delaware chancery courts.

¶ 82. For example, in *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,* Nos. 13911 and 14595, 1996 WL 307444, at *4 (Del. Ch. June 4, 1996), a Delaware case, the court addressed the precise issue presented in this case. *Moore* involved a former director of a corporation who sought information regarding confidential communications between the corporation and its attorney during the former director's tenure on the board. The other directors had received legal advice regarding a repurchase of the former director's stock; the former

---

[5] *Glidden Co. v. Jandernoa,* 173 F.R.D. 459, 474 (W.D. Mich. 1997); *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,* Nos. 13911 and 14595, 1996 WL 307444, at *6 (Del. Ch. June 4, 1996).

[6] *See, e.g., HMO-W Inc. v. SSM Health Care Sys.,* 2000 WI 46, ¶¶ 29–31, 38, 234 Wis. 2d 707, 611 N.W.2d 250 (following Delaware law in rejecting application of minority discount in determining "fair value" in dissenters' rights proceeding); *Jacobson v. American Tool Companies,* 222 Wis. 2d 384, 397, 588 N.W.2d 67 (Ct. App. 1998) (looking to Delaware law to define fiduciary duties); *Advance Concrete Form, Inc. v. Accuform, Inc.,* 158 Wis. 2d 334, 344, 462 N.W.2d 271 (Ct. App. 1990) (citing Delaware cases to determine whether request to inspect corporate documents was for a "proper purpose"); *Schweiner v. Hartford Accident & Indem. Co.,* 120 Wis. 2d 344, 351, 354 N.W.2d 767 (Ct. App. 1984) (citing Delaware law for effect of statutory merger on liabilities of merger corporation).

director had been excluded from secret meetings held by the other directors. *Moore* reasoned that the former director would have been entitled to examine the documents while he was a member of the board. Thus, *Moore* held that a corporation cannot assert attorney-client privilege in order to deny a director access to legal advice furnished to the board during the director's tenure without alerting the former director that certain communications would be concealed from that director during the director's tenure.

¶ 83. The *Moore* court is joined by numerous courts that have considered this issue.[7]

¶ 84. *Moore* is persuasive because, unlike the authorities relied upon by the majority opinion, *Moore* directly addresses the question in the present case: Can Lane have access to documents created during Lane's former tenure as a corporate director and that are now claimed by the remaining directors (the Scarberrys) to be subject to the corporation's attorney-client privilege?

---

[7] *See, e.g., Carnegie Hill Fin., Inc. v. Krieger,* No. 99–CV-2592, 2000 WL 10446, at *2 (E.D. Pa. Jan. 5, 2000) (former directors entitled to discover corporation's attorney-client privileged documents that they could have seen prior to their resignations); *Glidden Co. v. Jandernoa,* 173 F.R.D. 459, 473 (W.D. Mich. 1997) (directors have a right to access attorney communications of the company relating to the time that they served as directors); *Resolution Trust Corp. v. Adams,* No. 93–389–CIV-ORL-18, 1994 WL 315646, at *1 (M.D. Fla. Apr. 14, 1994) (rejecting any privilege asserted to any privileged documents that former corporate director previously had a right to possess or control); *Gottlieb v. Wiles,* 143 F.R.D. 241, 247 (D. Colo. 1992) (corporation may not assert attorney-client privilege against former director); *Kirby v. Kirby,* No. Civ. A. 8604, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987) (attorney-client privilege may not be invoked against those persons who were directors at the time the requested documents were prepared).

Like *Moore,* Lane was excluded from privileged information that was provided secretly to the corporation's other directors against Lane's interest during Lane's tenure as a corporate director. Lane had no reason to expect he would be denied full access during his tenure as a director to legal advice provided to the corporation.

¶ 85. The entity theory, according to the majority opinion, allows "the corporate lawyer to focus on representing only the best interest of the client corporation." Majority op. at ¶ 33 n.14. This language makes it sound as if corporate counsel has become the corporation's guardian ad litem and that the corporation's lawyer must speak for the corporation's best interest, perhaps regardless of the wishes of the board of directors or shareholders. The Wisconsin Rules of Professional Conduct for Attorneys adopt an entity view. *See* SCR 20:1.13(a) and (b).

¶ 86. The comments to the Rules of Professional Conduct for Attorneys nevertheless recognize that the entity is made up of individuals and that an attorney has obligations to the individuals. The comments caution that when an organization's interest might presently be or might later become adverse to the interest of one or more constituents of the organization, whether the organization be a partnership or a corporation, a lawyer must advise the constituent that the lawyer has a potential conflict of interest, that the lawyer cannot represent that person, and that the person may wish to obtain independent representation. (A constituent of a corporation is, for example, a shareholder or director.) The Rules of Professional Conduct for Attorneys also recognize, however, that a lawyer representing an organization may, under certain circumstances, also represent any of its partners, directors, or shareholders

individually, subject to the general conflict of interest rule set forth in SCR 20:1.7.[8]

¶ 87. Just what is the best interest of the corporate entity, Sharp Packaging, in the present case? Why is permitting the Scarberrys or Sharp Packaging to assert the corporation's alleged attorney-client privilege against Lane in the best interest of the corporation? Is it in the corporation's best interest to incur debt and deplete corporate assets by a $3.8 million distribution to the shareholders? The majority opinion implies that Lane is not acting in the best interest of the corporation. The majority opinion "finds it significant that Lane is acting in his individual capacity and requests the documents for personal gain against the corporation." Majority op. at ¶ 34 n.16. However, the majority opinion does not consider whether the Scarberrys might also be acting in their individual capacity for their personal gain in denying Lane access to the corporation's legal documents.

---

[8] For a discussion of the entity approach and issues of professional ethics faced by lawyers who represent partnerships and small business corporations, see, for example, Susanna M. Kim, *Dual Identities and Dueling Obligations: Preserving Independence in Corporate Representation,* 68 Tenn. L. Rev. 179 (2001); Paul J. Sigwarth, *It's My Privilege and I'll Assert It If I Want To: The Attorney-Client Privilege in Closely-Held Corporations,* 23 J. Corp. L. 345 (1998); Bryan J. Pechersky, *Representing General Partnerships and Close Corporations: A Situational Analysis of Professional Responsibility,* 73 Tex. L. Rev. 919 (1995); Nancy J. Moore, *Expanding Duties of Attorneys to "Non-Clients": Reconceptualizing the Attorney-Client Relationship in Entity Representation and Other Inherently Ambiguous Situations,* 45 S.C. L. Rev. 659 (1994); Lawrence E. Mitchell, *Professional Responsibility and the Close Corporation: Toward a Realistic Ethic,* 74 Cornell L. Rev. 466 (1989).

¶ 88. Raising these issues reminds us that the entity theory is a legal fiction and that this legal fiction may not be a valuable analytical tool in cases involving a closely held corporation. As one commentator stated, "although the entity fiction makes sense in the context of a large, publicly held corporation, the distinction between the entity and its constituents begins to blur in the context of a small general partnership or close corporation."[9]

¶ 89. I have thus far responded to the majority opinion using its entity theory. I now present another way of looking at this case: the closely held corporation approach. In a closely held corporation, the line between the entity and the individuals who own or control the entity often becomes blurred.[10] The most significant or perhaps sole relevant interests in a closely held corporation might be those of the constituents, that is, the shareholders and the directors. A closely held corporation may be a separate legal entity for purposes of its relation with outsiders, but with respect to its constituents (that is, intra-entity relations), the fictional "entity" may have little, if any, import. The court should look at the practical realities of the closely held corporation in determining attorney-client questions in the particular situation before the court.[11]

---

[9] Bryan J. Pechersky, *Representing General Partnerships and Close Corporations: A Situational Analysis of Professional Responsibility,* 73 Tex. L. Rev. 919, 930 (1995).

[10] Susanna M. Kim, *Dual Identities and Dueling Obligations: Preserving Independence in Corporate Representation,* 68 Tenn. L. Rev. 179, 192 (2001).

[11] "No application of the attorney-client privilege can be made without concrete reference to the specific issues and the particular set of facts of the case in which the privilege is sought

¶ 90. The Scarberrys (sole shareholders), Sharp Packaging (a closely held corporation), and Lane embarked on a joint undertaking to manage and operate Sharp Packaging and to give Lane an ownership interest in Sharp Packaging. As early as 1991–1992, the Scarberrys and Sharp Packaging used Lane as a consultant. That relationship grew and Lane became executive vice president for sales and marketing for Sharp Packaging.

¶ 91. In the fall of 1994, the Scarberrys, Sharp Packaging, and Lane jointly retained Attorney Paul Meissner to prepare agreements to formalize the terms of Lane's employment with and equity interest in Sharp Packaging. The Scarberrys individually, Sharp Packaging, and Lane each signed a March 1995 agreement, making the Scarberrys and Lane collectively responsible for the proper management of Sharp Packaging and enabling Lane to acquire an ownership interest in Sharp Packaging.

¶ 92. By their agreement, the Scarberrys (the shareholders), Sharp Packaging (the corporation), and Lane (a director) shared a common interest in the success of Sharp Packaging. Also by their agreement, Lane was given powers as a director of Sharp Packaging to protect his ownership and management interests in the joint undertaking with the Scarberrys and Sharp Packaging and to protect against acts by the Scarberrys or Sharp Packaging that would be adverse to his interests in the joint undertaking. The Scarberrys and Lane clearly shared a common interest in and with Sharp Packaging.

to be invoked." *State ex rel. Dudek v. Circuit Court,* 34 Wis. 2d 559, 582, 150 N.W.2d 387 (1967).

¶ 93. Attorney Niebler and members of his law firm handled a wide variety of legal matters for Sharp Packaging and also for the Scarberrys individually during this joint undertaking.[12] Because of these dealings and relationships, a fact-finder could conclude that the Scarberrys, Sharp Packaging, and Lane could each assume that when Attorney Niebler represented and billed Sharp Packaging, he was or should have been undertaking an attorney-client relationship with each of them.[13] During their joint undertaking, the Scarberrys and Lane developed adverse interests. And thus, this lawsuit.

¶ 94. The situation in the present case is, as a Colorado federal district court stated, analogous to a situation in which persons with a common interest retain a single attorney. Here, the Scarberrys, Sharp Packaging, and Lane had a common interest. They were in a joint undertaking involving the management and

---

[12] Attorney Niebler's affidavit states his relationship with the Scarberrys, Sharp Packaging, and Lane as follows:

> Attorney Niebler has represented both the Scarberrys and Sharp Packaging since 1984.

> Attorney Niebler represented the Scarberrys and Sharp Packaging in their 1991 dealings with Lane.

> Sometime in 1992 Attorney Niebler became cognizant that litigation might develop between the Scarberrys, Sharp Packaging, and Lane.

> Since 1992 Attorney Niebler and his law firm have continued to handle a wide variety of legal matters for the Scarberrys individually and Sharp Packaging.

[13] The existence of an attorney-client relationship depends on the facts and circumstances of each case. *See* Note, *An Expectations Approach to Client Identity,* 106 Harv. L. Rev. 687 (1993) (advocating the "reasonable constituent expectation approach").

ownership of Sharp Packaging. Sharp Packaging was one with and the same as the persons in the joint undertaking. When Attorney Niebler represented Sharp Packaging, he was representing the joint undertaking and each member thereof. When the persons who joined together later develop adverse interests, they may not assert the attorney-client privilege against one another as the basis for withholding legal information developed during their joint undertaking.[14]

¶ 95. In summary, using either the entity theory or the closely held corporation approach, I would uphold the circuit court's discretionary rulings allowing discovery. Sharp Packaging's attorney-client privilege for legal advice that was developed for Sharp Packaging while Lane was a member of the board of directors and also while Lane was a member of the joint undertaking with Sharp Packaging and the Scarberrys cannot be asserted against either Lane or the Scarberrys.

¶ 96. For the reasons set forth, I dissent.

¶ 97. I am authorized to state that Justices WILLIAM A. BABLITCH and ANN WALSH BRADLEY join this opinion.

---

[14] *Gottlieb v. Wiles,* 143 F.R.D. 241, 247 (D. Colo. 1992). *Cf. McCormick on Evidence* § 91 at 365–66 (5th ed. 1999) (when parties with a common interest retain a single attorney to represent them, but later become adverse parties, thereafter neither party is permitted to assert the attorney-client privilege as to the communications that occurred during the period of common interest).